STATE OF INDIANA; Otis R. Bowen, M.D., Governor of the State of Indiana; Joseph D. Cloud, Director of the Indiana Department of Natural Resources; and Indiana Department of Natural Resources, Plaintiffs,

v.

Cecil D. ANDRUS, as Secretary of the United States Department of the Interior; Walter J. Heine, as Director of the Office of Surface Mining Reclamation and Enforcement; Office of Surface Mining Reclamation and Enforcement; United States Department of the Interior; and the United States of America, Defendants.

INDIANA COAL ASSOCIATION; Meadowlark Farms, Inc.; Amax Coal Company, a division of Amax Inc.; Peabody Coal Company; and John A. Conlon, a resident and citizen of the State of Indiana, Plaintiffs,

v.

The UNITED STATES of America; the United States Department of the Interior; Cecil D. Andrus, as Secretary of the United States Department of the Interior; the Office of Surface Mining Reclamation and Enforcement; and Walter J. Heine, as Director of the Office of Surface Mining Reclamation and Enforcement, Defendants.

Civ. Nos. IP 78–500–C, IP 78–501–C.

United States District Court,
S. D. Indiana,
Indianapolis Division.

June 10, 1980.

Probable Jurisdiction Noted Oct. 6, 1980.

See 101 S.Ct. 67.

Deputy Atty. Gen. Jack O'Neill, for State of Indiana.

G. Daniel Kelley, Jr., of Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for Indiana Coal Assn., et al.

Jeffrey Klinger, Evansville, Ind., for Peabody Coal.

Wayne L. Kelley, Indianapolis, Ind., for Amax Coal.

Alfred T. Ghiorzi, Washington, D. C., Deputy U. S. Atty. Harold R. Bickham, Indianapolis, Ind., for Dept. of Interior.

## MEMORANDUM OF DECISION

NOLAND, District Judge.

Plaintiffs in these consolidated actions seek a judgment declaring various portions of the Surface Mining and Control Act of 1977 (the Act), 30 U.S.C. §§ 1201 to 1328, unconstitutional, as well as a permanent injunction preventing enforcement of the challenged provisions by the Secretary of the Interior. The matter came before the Court for a trial on the merits on April 24, 1980, pursuant to joint motion and procedural stipulation by the parties. Defendant's motion to dismiss, taken under advisement at that time, will be treated as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and is hereby DENIED.

Plaintiffs include AMAX, Inc., through its division AMAX Coal Company, Peabody Coal Company, and members of the Indiana Coal Association, each of whom is an owner or operator of surface coal mines within the State of Indiana, Meadowlark Farms, Inc., which owns interests in realty, some of which are coal interests which it leases to AMAX, Inc., and conducts farming operations and other activities on the reclaimed land, James A. Conlon, a resident and citizen of the State of Indiana as well as the State of Indiana, Otis R. Bowen, M.D., its Governor, Joseph D. Cloud, Director of the Indiana Department of Natural Resources which, pursuant to *Ind. Code* 513–4–6–4

(1976), is responsible for supervising and enforcing the Indiana Strip Mining Reclamation Act, and the Indiana Department of Natural Resources.

Defendant Office of Surface Mining Reclamation and Enforcement, its director, Walter J. Heine, and Cecil D. Andrus as Secretary of the Department of the Interior, are responsible for administering the Act and enforcing its provisions.

The complaints allege that the challenged provisions exceed the regulatory authority conferred upon the federal government under the Commerce Clause of the United States Constitution and are not reasonably related to the legitimate end of controlling commerce–affected environmental problems, that they are unconstitutional land use control and planning regulations violative of the Tenth Amendment, that they place disproportionate burdens upon surface mining operations, and therefore upon Indiana coal mining, which is almost exclusively of the surface mining variety, and that they constitute a taking of property without just compensation, in violation of due process and Taking Clause requirements of the Fifth Amendment. Specifically, the challenged provisions, all of which are within Title V of the Act, are:

(a) § 507(b)(16) [30 U.S.C. § 1257(b)(16)];

(b) § 701(20) [30 U.S.C. § 1291(20)];

(c) § 508(a)(2), (3), (4), (8) and (10) [30 U.S.C. § 1258(a)(2), (3), (4), (8) and (10)];

(d) § 510(d)(1) [30 U.S.C. § 1260(d)(1)];

(e) § 515(b)(7) [30 U.S.C. § 1265(b)(7)];

(f) § 515(b)(19) [30 U.S.C. § 1265(b)(19)] insofar as that portion which provides " . . . achieve the approved postmining land use plan . . .";

(g) § 515(b)(20) [30 U.S.C. § 1265(b)(20)], as to that portion which provides, "when the regulatory authority approves a long–term intensive agricultural postmining land use" and further that portion "when the regulatory authority issues a written finding approving a long–term, intensive, agricultural postmining land use as part of the mining and reclamation plan . . .;", and any other part which requires any post–mining land use.

(h) § 519(c)(2) [30 U.S.C. § 1269(c)(2)], as to that portion which provides " . . . until soil productivity for prime farm lands has returned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices";

(i) § 515(b)(3) [30 U.S.C. § 1265(b)(3)];

(j) § 515(b)(5) [30 U.S.C. § 1265(b)(5)];

(k) § 522(a), (c), (d), (e)(4) and (5) [30 U.S.C. § 1272(a), (c), (d), (e)(4) and (5)]; and

(*l*) § 510(b)(1) and (2) [30 U.S.C. § 1260 (b)(1) and (2)] to the extent that it requires that a permit application be denied or approved depending on approval of the postmining land use or of any change in postmining land use from the premining land use.

(m) § 518(c) [30 U.S.C. § 1268(c)].

(n) § 508(a)(2)(C) [30 U.S.C. § 1258(a) (2)(C)] as to that portion "the productivity of the land prior to mining including appropriate classification as prime farm lands, as well as the average yield of food, fiber . . . products . . . obtained under high levels of management;"

(*o*) § 519(c)(2) [30 U.S.C. § 1269(c)(2)] as to that portion which provides that a bond on prime farmland may not be released "until soil productivity for prime farm lands has returned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices . . .".

The challenged provisions constitute the heart of the Act, which was promulgated in 1977 primarily to counteract perceived adverse environmental effects of surface mining operations. See 30 U.S.C. § 1201(c). The legislation established a uniform set of mining and reclamation regulations to be implemented by way of conforming state enforcement programs, approval and super-

vision of which was made the responsibility of the newly–created Office of Surface Mining Reclamation and Enforcement. The Act is effective in two stages. From August 3, 1977 until either a state or federal program is implemented, a limited number of provisions are in effect [§§ 501–504, 30 U.S.C. §§ 1251–1254.] This is commonly denoted as the interim phase, during which period the states must issue permits requiring compliance with the interim aspects of the federal Act [§ 502(a) and (b), 30 U.S.C. § 1252(a) and (b)]. Most of Title V become effective when either a state program is approved or a federal program is implemented [§ 504(a), 30 U.S.C. § 1254(a)], and an operator must submit an application with reclamation plans for a permit within two months of the approval of a state program or the implementation of a federal program [§ 502(d), 30 U.S.C. § 1252(d)]. The Secretary of the Interior has issued regulations for the interim period [republished as 30 C.F.R. §§ 710–725] pursuant to § 501(a) [30 U.S.C. § 1251(a)], and regulations for the formulation, submittal and review process of state programs, as well as for permanent aspects of the Act [30 C.F.R. §§ 700–899], pursuant to § 501(b) [30 U.S.C. § 1251(b)].

To retain authority over the regulation of surface mining operations and other matters encompassed within the Act, the states must pass laws and regulations for and submit a state program to the Secretary of the Interior [§ 504, 30 U.S.C. § 1254]. The time for such submission was extended to March 3, 1980, by order of the District Court for the District of Columbia [*In Re Permanent Surface Mining Regulation Litigation*, 13 ERC 1447 and 1586 (1979)] because of the Secretary's delay in promulgating permanent regulations. A state program, including the legislation and regulations for the program, must conform to the Act and to the Secretary's regulations [§ 503(a)(1) and (7), 30 U.S.C. § 1253(a)(1) and (7)]. If the state program is not approved, the Secretary must promulgate a federal program for the state. Permits and enforcement would then be accomplished by the Office of Surface Mining Reclamation and Enforcement, a part of the Department of the Interior.

The Court's jurisdiction in this case is predicated upon 28 U.S.C. §§ 1331, 1337, 2201 and 2202. Standing exists by virtue of the fact that at least one party has standing in regard to each issue. *See California Banker's Association v. Schultz*, 416 U.S. 21, 44–46, 94 S.Ct. 1494, 1509–1510, 39 L.Ed.2d 812 (1974). Not all of the contested provisions are a part of the currently effective interim program. However, judicial determination as to the validity of various portions of the soon to be effective permanent program, with which any Indiana program must comply, will serve to clarify the extent to which the state program must conform to the Act's particularized requirements, and avoid enactment by the Indiana legislature of unnecessary laws and regulations. There can be no doubt that plaintiffs are currently aggrieved by the provisions being challenged. The Act has necessitated huge expenditures on the part of Indiana surface mine operators, and threatens to destroy Indiana's competitive position as a supplier of coal. Plaintiff AMAX Coal Company in 1978 expended approximately $27,000,000 to purchase equipment required in order to comply with the Act and incurred an additional $8,100,000 in increased operating costs for its four Indiana mines. The figures for 1979 were $6,000,000 for additional equipment and over $8,000,000 in increased operating costs. These figures do not include pollution control costs or blasting expenditures, but rather are limited to costs made necessary by the prime farmland, topsoiling, and approximate original contour requirements of the Act, challenged herein. The huge cost increases have already led AMAX to close one mine just prior to the effective date of the Act's interim program, resulting in the loss of 152 jobs and over 600,000 tons of coal production annually. *See* Plaintiffs' Exhibits 9, 10, 29 and 30.

The Court has reviewed the testimony, arguments, exhibits, briefs and relevant caselaw in this cause, and has concluded that, for reasons set out more fully below, vari-

ous portions of Title V of the Surface Mining Control and Reclamation Act of 1977 exceed Congress' powers under the Commerce Clause, impinge upon the sovereign powers of the State of Indiana in violation of the Tenth Amendment, and contravene due process and Taking Clause provisions of the Fifth Amendment. Accordingly, these provisions must be declared invalid. Plaintiffs have submitted what the Court considers to be a thorough yet concise statement of proposed findings of fact and conclusions of law in this matter. The Court now adopts and sets forth below as its own these findings and conclusions as required by Rule 52 of the Federal Rules of Civil Procedure. An Order and Judgment embodying the Court's conclusions herein will accompany this opinion.

## I.

## COMMERCE CLAUSE

(A) *Issues*:

Plaintiffs assert that provisions of Title V are attempts by Congress to regulate facets of surface coal mining operations which have no substantial adverse effect on interstate commerce, or that these provisions are not a means reasonably or plainly adapted to any legitimate end permitted by the Constitution under the Commerce Clause, that is, removing substantial adverse effects on interstate commerce.

Under these issues plaintiffs challenge "the prime farmland provisions" which encompass the following sections of Title V:

§ 507(b)(16) [30 U.S.C. § 1257(b)(16)] which requires the applicant to identify in the permit application the location of "prime farmlands" on which surface mining operations are to be conducted, pursuant to the definition of prime farmland as established by the Secretary of Agriculture pursuant to § 701(20) [30 U.S.C. § 1291(20)];

§ 508(a)(2)(C) [30 U.S.C. § 1258(a)(2)(C)] which requires that the reclamation plan submitted with the application include a statement concerning "the productivity of land prior to mining, including appro-

priate classification as prime farm lands, as well as the average yield of food, fiber ... products from such lands obtained under high levels of management ...;"

§ 510(d)(1) [30 U.S.C. § 1260(d)(1)] which requires that the regulatory authority, before issuing a permit to conduct surface mining operations on prime farmland, shall consult with the Secretary of Agriculture, and grant a permit to mine on prime farmland only if the regulatory authority finds that the operator "has the technological capability to restore such mined area ... to equivalent or higher levels of yield as non–mined prime farmland in the surrounding area under equivalent levels of management and can meet the soil reconstruction standards in Section 515(b)(7) ...;"

§ 515(b)(7) [30 U.S.C. § 1265(b)(7)] which requires the separate removal and replacement of the A, B and C soil horizons in the instance of prime farmland;

§ 515(b)(20) [30 U.S.C. § 1265(b)(20)] as to that portion which provides, "when the regulatory authority approves a long–term intensive agricultural postmining land use", and further that portion "when the regulatory authority issues a written finding approving a long–term, intensive, agricultural postmining land use as part of the mining and reclamation plan ...", and any other part which requires any postmining land use;

§ 519(c)(2) [30 U.S.C. § 1269(c)(2)] which provides that the bond for mining on prime farmland may not be released "until soil productivity for prime farm lands has returned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices...."

[Hereafter the foregoing provisions are referred to as "the prime farmland provisions."]

The plaintiffs under these issues further challenge the approximate original contour requirements of § 515(b)(3) [30 U.S.C. § 1265(b)(3)], the topsoiling requirements of § 515(b)(5) [30 U.S.C. § 1265(b)(5)], and the areas unsuitable for surface mining provi-

sions § 522(a), (c), (d) and (e)(4) and (5) [30 U.S.C. § 1272(a), (c), (d) and (e)(4) and (5)].

Plaintiffs also challenge those provisions of the Act which combine to require a commitment by an operator to a certain postmining land use, as well as the approval of such postmining land use by the regulatory authority as a condition to the applicant being granted a permit to mine. These provisions are: § 507(d) [30 U.S.C. § 1257(d)] which requires the submission of an acceptable reclamation plan, which must contain information regarding the premining and postmining use, as well as the productivity of land, and those which require a detailing in the plan of how the proposed postmining land use will be achieved, as well as necessary support activities for the proposed postmining land use, all as contained in § 508(a)(2), (3), (4), (8) and (10) [30 U.S.C. § 1258(a)(2), (3), (4), (8) and (10)]; § 510(b)(1) and (2) [30 U.S.C. § 1260(b)(1) and (2)] which require that a permit application be denied unless all of the application requirements are accurate and complete and that the reclamation requirements including the land use concepts as set forth above, "can be accomplished"; and certain portions of § 515(b)(19) and (20) [30 U.S.C. § 1265(b)(19) and (20)] which are respectively the "approved postmining land use plan", and "the regulatory authority approves a long term intensive agricultural postmining land use", and "the regulatory authority issues a written finding approving a long-term, intensive, agricultural postmining land use as part of the mining and reclamation plan. . . ."

█ The Court's inquiry on the question of whether Congress has properly exercised the Commerce Clause power is a very specific, limited and two-fold inquiry: First, this Court must "determine whether the particular activity [facet of surface mining operations] regulated or prohibited is within the reach of the federal power," *United States v. Darby*, 312 U.S. 100, 120–21, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941), that is, whether there is a rational basis for Congress to conclude that the particular facet of surface mining operations regulated or

prohibited has a substantial and adverse effect on interstate commerce. A "trivial impact on commerce" may not be used by Congress "as an excuse for broad general regulation of state or private activities," *Maryland v. Wirtz*, 392 U.S. 183, 196 n.27, 88 S.Ct. 2017, 2024 n.27, 20 L.Ed.2d 1020 (1968). Second, "the means chosen," that is the form of regulation, must be "reasonably adapted" or "plainly adapted" to the legitimate end of removing the substantial and adverse effect on interstate commerce. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 262, 85 S.Ct. 348, 350, 13 L.Ed.2d 258 (1964), *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

(B) *Findings*:

1. Surface coal mining operations on prime farmland, as distinguished *per se* from any other type of land, have an infinitesimal or trivial impact on interstate commerce. The extent and distribution of prime farmland in the United States was presented to Congress in the form of the *Report Of The Interagency Task Force On The Issue Of A Moratorium Or A Ban On Mining In Prime Agricultural Lands*, prepared by Office of Management and Budget, Soil Conservation Service, Bureau of Mines, Federal Energy Administration, and the Environmental Protection Agency (hereinafter the "Report"). The Report was presented with a report entitled *Restoring Soil Productivity On Surface-Mined Land*, Johnson, McCormack and Sampson (1977), which was presented to the House Committee at *Briefing Presentation By The Soil Conservation Service Before The Committee On Interior And Insular Affairs*, U.S. House of Representatives, April 5, 1977. [See 43 Fed.Reg. 41,716 (1978), Part III; Exhibit 3 to Deposition of Neil Sampson (one of the authors).]

2. The legislative history demonstrates that the Report was before Congress, which relied on the Report in enacting the Act. The House Committee Report states as follows:

The Carter Administration has recommended that a 5–year moratorium be placed on mining on prime agricultural lands until studies are conducted to learn if the soil can be returned to its original productivity. . . . Furthermore, *data contained in the report of the Interagency Task Force on the Issue of a Moratorium or a Ban on Mining in Prime Agricultural Lands appears to confirm the view that a moratorium is not justified.* [H.R. Rep.No. 95–213, 95th Cong., 1st Sess. 185 (1977); U.S.Code Cong. & Admin.News 1977, pp. 593, 715 emphasis added.]

Such Congressional reliance is further shown by the fact that the data set forth in the Report, as well as that presented by Mr. Sampson, was presented to the Senate and printed in the Records. [123 Cong.Rec. 58,-105 (daily ed. May 20, 1977).]

3. The Report disclosed the results of a Soil Conservation Service study conducted in 1975 to evaluate the status of the Nation's croplands in 1975 by comparison of the current land use on sample plots with the land use in 1967. It was found that the Nation contains a total of 384,000,000 acres of "prime farmland," of which 250,000,000 acres (or 65%) was used for the production of crops. [See also H.R.Rep.No. 95–218, 95th Cong., 1st Sess. 105–06 (1977).] Approximately 134,000,000 acres of prime farmland was not in cropland use. The study disclosed that an annual average of 1,000,000 acres of prime farmland was converted to urban and water uses during the period 1967 to 1975. Of the 8,000,000 acres of prime farmland lost to such use during that period of time, 6,500,000 acres were converted to urban uses and 1,500,000 acres to water uses, or 80% and 19% respectively. [Report, p. 6, Table 5.]

4. Further studies were conducted based upon the annual production of surface coal mining in the United States in 1977 and its effect on prime farmland. The studies showed that approximately 21,800 acres of prime farmland were disturbed by surface mining on an annual basis. This constitutes only 2% of the 1,000,000 acres per year that is irretrievably lost to urban and water use.

Further, it constitutes only *six one–thousandths* of one percent [0.006%] of the total prime farmland in the United States. It would take 166 years for surface mining to disturb 1/100 (one one–hundredth) of the total prime farmland in the United States. Therefore, it was determined that the impact of surface mining on the loss of prime farmland was negligible. The Report concluded that even if the entire 21,800 acres of prime farmland affected in 1977 came entirely out of corn production, the yearly effect based on the 1976/1977 crop year would be less than *0.04%*. In comparison, through the Agricultural Stabilization and Conservation Service, the Federal Government is paying farmers *not* to grow crops on 5,900,000 acres. [Plaintiffs' Exhibit 20.] This is 200 times the amount of prime farmland disturbed annually by surface coal mining.

5. The Report concluded that the United States has ample farmland to meet its domestic needs for the foreseeable future. The Report concluded:

[E]ven assuming a worst case senario [sic] in which the entire 13,800 acres of prime farmland annually affected by surface mining in the Illinois, Indiana, Western Kentucky coal fields were lost permanently to farm production, total acreage losses over a 30 year period would amount to 414,000 acres. Further assuming that the entire impact of the loss would be on corn production, the total production loss in the 30th year would be less than 1% of the national 1976/1977 yields. [Report, p. 21.]

The Report also concluded:

The United States has ample farmland to meet its domestic needs for the foreseeable future. However, there are some persons who believe that there exists an ethical responsibility to retain as much as possible the existing farmlands of this Nation. In their view there is a humanitarian aspect of this problem and they believe that every acre of prime farmland that goes out of production represents loss of food stocks which could be made available to people in less developed areas

of the world. This view generally does not recognize the issues associated with getting the food from the United States to those needy in other countries, e. g., transportation costs, foreign limitations of the less developed countries, and the views of other countries exporting agricultural products. [Report, p. 6.]

6. There are 11,500,000 acres of prime farmland in Indiana. [Affidavit of Dideriksen.] The six major coal producing counties in Indiana (Sullivan, Warrick, Clay, Greene, Pike and Vermillion) produce more than 80% of Indiana's surface mineable coal [Plaintiffs' Exhibit 13], but contribute less than 5% of the annual production of corn, soybeans and wheat in Indiana [Plaintiffs' Exhibit 14]. Only 40,000 acres of prime farmland are projected to be disturbed by surface mining in Indiana in the next 20 years. [Affidavit of Smith.] That amounts to only 3/1,000 (three one–thousandths) of the total prime farmland in Indiana. Throughout all the Cornbelt States, it is projected that only 41,000 two one-thousandths of the total prime farmland within those states will be disturbed by surface mining in the next 20 years [Reference 1 to Defendants' evidence in opposition to Motion For Preliminary Injunction]. The Agricultural Stabilization and Conservation Service paid Indiana farmers *not* to grow crops on 369,135 acres in 1977. [Plaintiffs' Exhibit 20.] Thus, the Federal Government is paying Indiana farmers not to farm nearly 1,000% more land than would be affected by surface coal mining in Indiana in the next 20 years.

7. The approximate original contour, topsoiling and prime farmland provisions of the Act are totally unrelated to the enhancement of air and water quality [Tr. 94–97; Plaintiffs' Exhibit 21]. The four identified pollutants are iron, manganese, suspended solids and acidity (pH), [Tr. 94; 30 C.F.R. § 715.17; 30 C.F.R. § 616.42.]

8. Requiring the return of prime farmland to the use of farming in postmining use would actually increase water pollution. One of the more serious problems with respect to water pollution within the State of Indiana is that of sedimentation (or suspended solids) in streams which is caused by farming. [Tr. 96.] Thus, the prime farmland provisions of the Act would increase or cause an adverse effect of surface coal mining operations on water quality.

9. The Report of the 208 Water Quality Program study and analysis [hereinafter "208 Report"] shows that active surface mining in Indiana is not causing any surface water quality problems, and that to the extent that water quality problems exist in Indiana, such problems are caused by land that was reclaimed prior to the 1967 Indiana surface mining reclamation law. [Plaintiffs' Exhibit 45; Defendants' Exhibit in Opposition to Motion for Preliminary Injunction, pp. 216–17.] The report also states that water quality aspects of Indiana mines are presently being controlled by the National Pollution Discharge and Elimination Systems Standards of the Clean Water Act which are "a major factor in preventing undesirable pollutants from entering surface waters from active strip mines." [208 Report, p. 217.]

10. Plaintiffs coal companies own and/or have rights to and presently intend to mine lands subject to § 522(e)(4) and/or (5) [30 U.S.C. § 1272(e)(4) and/or (5)]. [See Plaintiffs' Exhibit 33 and deeds and/or leases and maps attached thereto.]

(C) *Conclusions*:

1. "The prime farmland provisions" are directed at facets of surface coal mining which have no substantial and adverse effects on interstate commerce. Similarly, the prime farmland provisions are not related to the removal of air and water pollution and are, therefore, not a means [regulation] reasonably and plainly adapted to the legitimate end of removing any substantial adverse effect on interstate commerce. These sections, to the extent set forth, are not within powers delegated to Congress and are unlawful as being contrary to the Constitution.

2. The water pollutants are being controlled pursuant to § 515(b)(10) [30 U.S.C. § 1265(b)(10)] of the Act, which requires

minimizing disturbances to the prevailing hydrologic balance, and § 515(b)(8) [30 U.S.C. § 1265(b)(8)], which regulates the quality of discharges from permanent water impoundments. The water pollution control aspects of the Act are the requirements for settlement ponds, treatment ponds and that surface drainage or non-point sources be controlled, as well as point source discharges under the National Pollution Discharge Elimination System Standards of the Clean Water Act. Thus, the Act contains entirely separate provisions dealing with water pollution control, that is, separate and apart from the original contour, prime farmland and topsoiling provisions, as well as the other provisions being challenged by plaintiffs. Additional provisions of the Act which are plainly adapted to alleviating air and water pollution are § 515(b)(4) [30 U.S.C. § 1265(b)(4)], which requires stabilization and protection of all surface areas, including spoil piles, to effectively control erosion and air and water pollution; § 515(b)(11) [30 U.S.C. § 1265(b)(11)], which requires stabilization of mine wastes; § 515(b)(14) [30 U.S.C. § 1265(b)(14)], which requires that all debris, acid–forming materials, toxic materials or materials constituting a fire hazard are treated or buried and compacted or otherwise disposed of to prevent contamination of ground and surface water; § 515(b)(16) [30 U.S.C. § 1265(b)(16)], which requires that reclamation efforts proceed in an environmentally sound manner and as contemporaneously as practicable with surface coal mining operations; and § 515(b)(19) [30 U.S.C. § 1265(b)(19)], which requires the establishment on all regraded areas and other lands affected of "a diverse, effective, and permanent vegetative cover of the same seasonal variety native to the area ... and capable of self–regeneration and plant succession...."

3. The approximate original contour provisions [§ 515(b)(3), 30 U.S.C. §. 1265(b)(3)], the topsoiling requirements [§ 515(b)(5), 30 U.S.C. § 1265(b)(5)], the areas unsuitable for surface mining provisions [§ 522(a), (c), (d) and (e)(4) and (5), 30 U.S.C. § 1272(a), (c), (d) and (e)(4) and (5)]

are not directed at the alleviation of water or air pollution, to the extent there are such effects, and are not means reasonably and plainly adapted to removing any substantial and adverse effect on interstate commerce. These sections are outside the enumerated powers of Congress and are, therefore, unconstitutional and unlawful.

4. Those provisions of the Act which combine to require a commitment by an operator to a certain postmining land use, as well as approval of any changes in post-mining land use by a regulatory authority, as a condition to the operator being granted a permit to mine, are unrelated to removing any substantial and adverse effect on interstate commerce; and further, are not means reasonably and plainly adapted to the legitimate end of removing substantial adverse effects on interstate commerce; and are, therefore, unlawful and contrary to the Constitution. These provisions are § 507(d) [30 U.S.C. § 1257(d)], which requires the submission of an acceptable reclamation plan containing postmining land use consideration requirements as a part of the permit application; § 508(a)(2), (3), (4), (8) and (10) [30 U.S.C. § 1258(a)(2), (3), (4), (8) and (10)], requiring that the reclamation plan must contain information regarding the premining and postmining use and productivity of the land; § 515(b)(19) and (20) [30 U.S.C. § 1265(b)(19) and (20)] to the extent set forth in "the prime farmland provisions", pertaining to approval of the postmining land use; and § 510(b)(1) and (2) [30 U.S.C. § 1260(b)(1) and (2)], to the extent that it requires that a permit application be denied or approved depending on approval of the postmining land use or any change in postmining land use from the premining land use.

## II.

## TENTH AMENDMENT

(A) *Issues*:

Plaintiffs challenge the same provisions in Title V as set forth above in Part I(A)–Commerce Clause–Issues. Plaintiffs con-

tend these provisions when combined with those provisions of Title V which require that a State submit a State program in full conformity with the Act and the Secretary's regulations [§ 503(a)(1) and (7), 30 U.S.C. § 1253(a)(1) and (7)], or that the Federal Government through the Department of the Interior and OSM will promulgate a Federal program [§ 504, 30 U.S.C. § 1254], constitute displacement, or regulation, or alteration of the operation and structure of traditional or integral governmental functions essential to the sovereignty of the States contrary to the Tenth Amendment. The plaintiffs contend that the provisions challenged are in fact land use control and planning dictates, which also require and limit State governmental structures and procedures in land use control and planning, a traditional or integral governmental function or area of the sovereignty of the States.

The plaintiffs further contend that the land use control and planning policies in these provisions will have significant adverse effects for the State of Indiana, and that since these provisions are not based upon alleviating air or water pollution, when Federal and State interests are balanced, the State interests are paramount.

On the Tenth Amendment issues asserted by the parties, it is clear that the Tenth Amendment is a limitation upon congressional power under the Commerce Clause. *National League of Cities v. Usery*, 426 U.S. 833, 842–43, 96 S.Ct. 2465, 2470, 49 L.Ed.2d 245 (1976). This Court's inquiry pursuant to *National League of Cities* is whether the provisions of the Act being attacked are "(1) a congressional enactment (in the exercise of commerce clause powers) ... to displace, regulate or significantly alter (2) the management, structure or operation of (3) a traditional or integral governmental function ..." of the States. *Amersbach v. City of Cleveland*, 598 F.2d 1033, 1035–36 (6th Cir. 1979) (footnotes omitted). In some situations a balancing of Federal and State interests may be required because the Court in *National League of Cities* left standing *Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975). *See also Na-*

*tional League of Cities*, 426 U.S. at 856, 96 S.Ct. at 2476 (Blackmun, J., concurring), where a balancing approach interpretation is made of the Court's opinion.

(B) *Findings*:

1. As a matter of land use policy and control, it is evident from a review of the areas of prime farmland in the State of Indiana as defined by the Secretary of Agriculture that it is for the most part concentrated north of the surface mining coal producing areas in the southwestern Indiana. The six counties in southwestern Indiana which account for 80% of Indiana surface–mined coal account for less than 5% of the total production of agricultural commodities as corn, wheat, and soybeans in the State of Indiana [Plaintiffs' Exhibits 13 and 14]. Also to be noted is that the Agricultural Stabilization and Conservation Service in 1978 paid Indiana farmers not to produce crops on 369,135.9 acres [Plaintiffs' Exhibit 20]. What is "prime farmland" from the standpoint of land use control and planning within the State of Indiana may well not be prime farmland as established by the Secretary of Agricultural. Moreover, as to the highest and best land use subsequent to mining of prime farmland, it could well not be farming but rather forestry [Plaintiffs' Exhibit 41], or other uses.

2. From a land use control and planning consideration, the requirement that all mined prime farmland be returned to a farm use, at least through the release of bond, will not serve to decrease the loss of prime farmland to urban and water uses. However, if surface mined prime farmland is allowed to be returned to other uses which could well occur because of the suitable time which surface mining presents for a change in the use of land [see H.R. Rep.No. 95–218, 95th Cong., 1st Sess. 94 (1977); Conclusion No. 13, *infra*], such surface mined prime farmland could be converted to industrial, residential or recreational uses and prevent other non–mined prime farmland from being converted to such uses.

3. The coal deposits in Indiana are part of what is known as the Illinois Coal Basin or Eastern Interior Coal Basin. The center of the Basin is in southeastern Illinois. Only the eastern fringe of the basin lies within Indiana. From the center of the Basin in Illinois, which is up to 1,000 feet below the surface, the coal seams rise toward the surface in Indiana. Surface mining takes place along the periphery of the Basin in Indiana. Because of their depth, the coal deposits located in Illinois near the center of the Basin cannot be mined by the surface method. [Plaintiffs' Exhibits 5 and 12.]

4. The portion of the Illinois Coal Basin lying within Indiana is located along the west central border of the State and extends southward to the southwestern portion of the state. The major portion of such reserves is concentrated in southwest Indiana. [Plaintiffs' Exhibit 1.] Prime farmland in Indiana is dispersed throughout the State, with the major portion being in the northern and central parts of the state; only a small portion of it is in the coal area of southwestern Indiana. [Plaintiffs' Exhibits 2 and 4.] Thus, the vast majority of Indiana's prime farmland is not located coincidentally with the State's surface mineable coal reserves. Nevertheless, nearly all of plaintiffs' permit areas contain some prime farmland, some as much as 100% [Plaintiffs' Exhibits 7 and 8].

5. The major coal producing counties in Indiana are heavily dependent upon the surface coal mining industry for their financial well being, both private and public, and the delivery of their governmental services to the extent that, in one county (Warrick), over 50% of the total county revenues from personal or real property taxes is derived from the land use of the surface coal mining industry. [Plaintiffs' Exhibits 15–19.] Further, the entire Indiana electrical utility industry is inextricably tied to the land use of surface mining. The surface coal mining method accounts for 99% of Indiana's total coal production. Over 83% of Indiana's coal production is sold to Indiana public utilities under long–term coal contracts. [Plaintiffs' Exhibit 6.]

Major industry has located in southwest Indiana because of the ready supply of coal, such as the Alcoa operation in Warrick County, which employs over 3,500 persons. [Plaintiffs' Exhibit 11.]

6. The Indiana coal deposits are such that it is not economical at the present time to recover the coal by the underground mining method. Illinois and Western Kentucky coal seams are thicker and cleaner with better roof and floor conditions for underground mining. In contrast, Indiana seams are thinner, undulatory, erratic and multi–bedded with numerous shale partings. Further, Indiana has a known fault running parallel to the Wabash River with contemporaneous post depositional channels that disrupt coal seams and result in adverse roof conditions. [Plaintiffs' Exhibit 12.] Also, Indiana underground mineable deposits are of insufficient size. Approximately 83.8% of the coal produced in Indiana in 1977 was sold to Indiana utilities [Plaintiffs' Exhibit 6] under long–term contracts which generally require large blocks of coal of up to 50,000,000 tons. There are no underground mineable coal deposits of that magnitude in Indiana. [Plaintiffs' Exhibit 12.]

7. The coal reserves in Illinois are significantly more conducive to underground mining methods, than are those in Indiana. While 99% of Indiana's coal is produced by surface mining, over one–half (55% or 33,000,000 tons) of Illinois' annual coal production is produced by underground mining. There is only one underground mine planned in Indiana in the future, while eight new surface mines are planned. In Illinois, however, there are plans for 21 new underground mines and only nine surface mines. [Tr. 116.]

8. With respect to the use of coal in Indiana, which is primarily by Indiana public utilities, a shift has begun from Indiana surface mined coal to Illinois underground mined coal, at least part of which shift is because of the operating costs attributable to the provisions of the Act being challenged. The current delivered cost of Indi-

ana surface mined coal to Indiana utilities is $1.07 per million Btu. The current delivered cost of Illinois underground mined coal to Indiana utilities is $1.08 per million Btu. [Tr. 107–10; Plaintiffs' Exhibit 37.] In 1981 it is projected that only 28% of the coal required for new coal–fired electrical generators in Indiana will come from Indiana, while 29% will come from Illinois. [Tr. 114; Plaintiffs' Exhibit 38.] The remainder will come from other States, as Kentucky.

9. Thus, the express intent of the Act [see Conclusions, *infra*] to shift surface coal mining operations into underground coal mining operations will be achieved, and surface coal mining land use will probably shift from the State of Indiana into underground mining in Illinois and/or Kentucky. [Tr. 113–14.] As shown by U.S. Department of Energy projections, this shift has already begun [Plaintiffs' Exhibit 38]. These results are even more certain when Findings Nos. 1 and 2, Part IV(A) are considered.

10. Prior to the enactment of the Act, the Indiana Department of Natural Resources, Division of Reclamation had a total staff of approximately nine employees and an annual budget of approximately $236,-578. In order to comply with the interim phase requirements of the Act and federal regulations, the State of Indiana was forced to increase the staff and budget of the Division to 29 employees and $587,063 respectively [Plaintiffs' Exhibit 22].

(C) *Conclusions*:

■ 1. The Act [§ 503, 30 U.S.C. § 1253] requires that the States submit a State program conforming with "the requirements of this Act" and "regulations issued by the Secretary pursuant to this Act" [§ 503(a)(1) and (7), 30 U.S.C. § 1253(a)(1) and (7)], which program must be approved by the Secretary, or else the Federal Government will promulgate a program for the State [§ 504(a), 30 U.S.C. § 1254(a)]. This Court must view the portions of the Act challenged by the plaintiffs as if the Federal Government were going to administer the Act under a Federal program in

Indiana, for if sovereign functions of a State are dictated and confined by the Act under threat of a Federal program, it is not relevant that a State may ultimately "choose" under threat of Federal usurpation of a sovereign function to have a State program, make such decisions, and structure its government accordingly. If the Federal Government does not have the power to directly usurp functions and control the areas of the Act being challenged, then it is equally without the power to indirectly require such to be done by the States under the threat of Federal usurpation. If these provisions are "incapable of standing by themselves, then the provisions of the Act must fall." *Steward Machine Co. v. Davis*, 301 U.S. 548, 585–86, 57 S.Ct. 883, 890, 81 L.Ed. 1279 (1937); *National League of Cities, supra*. The fact that certain of the decisions might be made by the States under a State program is not sufficient. A State program must comport fully with the Act and regulations which contain inherent Federal decisions already made and which require that the States adopt certain governmental structures and procedures, or else have a Federal program. These considerations are apparent on the face of the Indiana Act passed to authorize the executive branch to submit an Indiana program, where the General Assembly [IC 13–4.1–1–1 *et seq.*] expressed the following:

Sec. 1. The general assembly finds that:

(1) P.L. 95–87, the federal Surface Mining Control and Reclamation Act of 1977, provides that the federal government will assume control of the regulation of surface coal mining operations and reclamation procedures within Indiana unless the state of Indiana enacts laws as specified by the federal act.

(2) The federal act in many parts constitutes an intrusion into land use planning and control, an integral and traditional aspect of the sovereignty of the state of Indiana, its people, and political subdivisions, as well as numerous other state and local governmental functions as reserved to them by the Tenth Amendment of the Constitution of the United States.

\* \* \* \* \* \*

(4) The threat that the federal government will regulate the surface coal mining operations and reclamation procedures, including land use planning and control, if the state of Indiana does not enact the necessary legislation for a state program, is coercive. It makes the overriding consideration whether to prevent further federal encroachment upon and regulation and control of the state, its people, and local industry, rather than what is in the best interest of the people of the state of Indiana, considering local employment opportunities, financing of local government, and the use of local and state natural resources with consideration for the geography and terrain of the area.

(5) The state of Indiana has challenged the federal act in a lawsuit presently pending before the United States District Court for the Southern District of Indiana, Indianapolis Division, entitled . . . .

■ 2. Regardless of whether the required Federal land use policies, the required governmental structures, and the required procedures for implementing land use control and planning policy decisions under the Act are instituted in Indiana through a federally mandated and confined State program or through a Federal program, the issues are the same. Even if a State program is instituted in Indiana, the Federal Government cannot do indirectly that which is unconstitutional to accomplish directly. In *National League of Cities*, had the Federal Government not legislated that the States pay certain minimum wages to employees which *indirectly* altered the States' choices as to the delivery of certain governmental services to their citizens, but attempted to directly usurp the delivery of these governmental services, it would have been an even clearer violation of the Tenth Amendment. If Indiana does submit a State program, it will have to comport fully with both the Act and the Secretary's regulations, which contain explicit and implicit federal land use control and planning policies and decisions, as well as required State governmental structures and procedures for further land use decisions. This constitutes

Federal regulation of the States as States as under *National League of Cities*. If there is no State program, then the Federal Government will directly usurp the functions which would be an even clearer violation of the Tenth Amendment than that which was prohibited in *National League of Cities*.

3. Land use control and planning is a traditional or integral governmental function or area of State sovereignty. This is required because of the very diverse geography, climate, natural resources, population density and economic structures within the various States, and this was expressly recognized by Congress in § 101(f) [30 U.S.C. § 1201(f)] of the Act. Land use control and regulation has historically always been exercised by State governments. Land use planning and control through zoning laws and their provisions "are peculiarly within the province of state and local legislative authorities." *Warth v. Seldin*, 422 U.S. 490, 508 n.18, 95 S.Ct. 2197, 2210, n.18, 45 L.Ed.2d 343 (1975). It is one of the most severe and restrictive governmental powers, considering its effect on individuals' property and on local governments as cities, counties and States. Land use planning and control most directly affect the people, industry and governmental entities directly connected with the land involved. In many situations it is the presumed local benefit-burden to the land owner and community in question which prevents a Fifth Amendment violation. The broader the public interest which defines that to be protected and the broader the constituency to which public officials must answer, the more diluted and non-existent are the local "benefits and burdens" on which the use restrictions are legally based. See *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 133, 98 S.Ct. 2646, 2663–2664, 57 L.Ed.2d 631 (1978).

4. The "prime farmland" provisions combine to have prime farmland defined by regulations of the Secretary of Agriculture, with an applicant's permit being conditioned upon a commitment to a postmining farm use, and require a postmining farm

use at least until the release of the bond, which will not be released until productivity has reached equivalent levels of yield as non-mined prime farmland in the surrounding area under similar levels of management [§ 510(d)(1), 30 U.S.C. § 1260(d)(1), and § 519(c)(2), 30 U.S.C. § 1269(c)(2)].

5. This period of postmining farming in order to achieve levels of productivity before the release of a bond could take up to ten years [§ 515(b)(20), 30 U.S.C. § 1265(b)(20)]. The required level of productivity on prime farmland cannot be returned without a protracted period of farming. See OSM Comments to 30 C.F.R. § 823.15, wherein it is stated:

According to Grandt (1978, p. 65) approximately 5 years' growth of deep-rooted legumes, such as alfalfa and grasses, on sites where the topsoil has been replaced should help restore the soil quality for cropland uses. . . . To ensure minimum delay in restoring the productive capacity of prime farmland, a 10-year limit has been placed on the time which can elapse between soil replacement and the initiation of the [3-year] performance test for revegetation success. [44 Fed.Reg. 15,287 (1979).]

6. These "prime farmland provisions" are *per se* land use control and planning decisions which will be implemented in Indiana either by a State program which cannot vary these provisions, or by a Federal program.

7. The expressions of the congressional leaders at the time of the introduction of the prime farmland provisions demonstrate the intent that such land should be returned to a use of farming and that this is explicitly required on the face of the prime farmland provisions. Senator Percy stated from the floor at the time of the introduction:

For the first time, the Federal Government would be taking into account that these prime agricultural lands are an invaluable resource to us, and we cannot simply pave over them, we cannot simply urbanize them all–and we simply cannot strip mine them, *unless we assure ourselves that all prime lands that are mined*

*will be returned to their original use and their original level of productivity.* [123 Cong.Rec. S8,105 (daily ed. May 20, 1977); emphasis added.]

8. This was also stated as the reason for the absence of a variance provision for prime farmland. Senator Culver stated:

Under the current bill the language states that an applicant for a new permit to strip mine must demonstrate that he can restore the land affected to a condition at least fully capable of supporting the uses which it was capable of supporting prior to any mining, or higher or better uses.

It is true, as the floor manager of the bill suggests, that implicit in this is that a reasonable person may interpret it, and so contrue it, that a restoration to *prime agricultural land use would be a minimal essentiality under that language. But that caveat of a higher or better use is the hooker. That is the loophole you can drive a truck through.* I shall tell why.

The effect of this amendment is to set a standard for reclamation of prime farm lands. Without this amendment, someone in the short term can determine that a better use is a recreational use; a better use is a residential use; a higher use is an industrial use. *We are giving all that discretionary authority to some bureaucrat.*

*I do not want to do that.* . . . [123 Cong.Rec. S8,111 (daily ed. May 20, 1977); emphasis added.]

9. The absence of variance provisions from the prime farmland provisions, and from the topsoil and the approximate original contour provisions, at least as meaningful to Indiana, demonstrates the postmining land use control and planning aspects of these provisions. While in other provisions which are applicable only to other parts of the country, i. e., mountaintops and steep slopes [§ 515(c) and (e), 30 U.S.C. § 1265(c) and (e)], variances have been provided based on "equal or better economic or public use of the affected land, as compared with premining use." The prime farmland, original contour and topsoiling provisions as

applicable in the Midwest have no meaningful variances. Implicit is that there is no higher and better postmining land use than is provided by the prime farmland, approximate original contour and topsoiling provisions in Indiana. This was the express congressional intent of disallowing variances as set forth in the Senate Report on the bill that evolved into the Surface Mining Act:

[T]he Committee did recognize that there are some valid and important reasons for allowing limited variances to prescribed standards of the bill, where such variances provide equal or better protection to the environment, *and result in a higher postmining land use.* [S.Rep.No. 95–218, 95th Cong., 1st Sess. 55 (1977); emphasis added.]

10. In commenting on the variance allowable from the approximate original contour in mining on steep slopes, it was stated:

[T]he technology of reclamation has come a long way. If the law is framed 'wisely and reasonably–without rigid contour requirements–there is no reason why further beneficial land uses cannot be carried out on reclaimed land. . . .

    \*     \*     \*     \*     \*     \*

It must be borne in mind that protection of environmental values does not in every instance require return to an original contour. [123 Cong.Rec. S8,101 (daily ed. May 20, 1977) (remarks of Senator Byrd).]

Thus, it is clear that the approximate original contour provision was enacted by Congress based upon land use considerations, and that the failure to provide such variances on prime farmland within the Midwest is a Federal land use decision that no higher or better use exists for such land.

11. The Act as applied in Indiana which contains no steep slopes and will not allow the State to make any variance in its program, nor will a Federal program have any variances, from the prime farmland or approximate original contour requirements or topsoiling requirements due to the express land use planning policy decisions of the Federal Government.

12. Other provisions require, as a condition to granting a permit to surface mine, that the regulatory authority approve changes in the postmining land use. Provisions of the Act also require that a proposed postmining land use differing from a premining land use be approved by a regulatory authority which either directly mandate state governmental structures or usurp the function in land use planning and control policy. See Part I(C), Conclusion No. 4 setting forth this effect from § 507(d) [30 U.S.C. § 1257(d)], § 508(a)(2), (3), (4), (8) and (10) [30 U.S.C. § 1258(a)(2), (3), (4), (8) and (10)], § 515(b)(19) and (20) [30 U.S.C. § 1265(b)(19) and (20)], and § 510(b)(1) and (2) [30 U.S.C. § 1260(b)(1) and (2)]. These provisions resulted in the Secretary's regulations [30 C.F.R. § 816.133] and the definition of "land use" in 30 C.F.R. § 701.5, which categorizes the various land uses and delineates that a change of the postmining land use from one of the categories set forth to another "shall be considered as a change to an alternative land use which is subject to approval by the regulatory authority."

13. The Congressional intent to regulate the use of land is shown in the legislative history, such as the following:

[T]he permit process requires the submission and *approval* of postmining land use and thus is designed to elicit an evaluation of the operator's plan and ability to return the land to a useful condition. . . .

. . . [S]urface mining also presents possible land planning. benefits as such mining involves the opportunity to reshape the land surface to a form and condition more suitable to man's uses. [H.R.Rep.No. 95–218, 95th Cong., 1st Sess. 93–94 (1977); emphasis added.]

14. It is self–evident on the face of the provisions concerning areas unsuitable for surface coal mining [§ 522, 30 U.S.C. § 1272] that it is directed solely at land use planning and control considerations through required government structures. Further, § 522(e)(4) [30 U.S.C. § 1272(e)(4)] mandates changes or a Federal usurpation of Indiana

County Commissioners' or the State Highway Department's authority to regulate county and state road relocations and closings.

15. That the foregoing provisions are directed primarily at land use control and planning policies is further evident from the fact that they are not related to control of air or water pollution as previously found by the Court. Additionally, in the instance of the prime farmland provisions, the use of farming is in fact a major contributor to water pollution by sedimentation.

16. The foregoing provisions require explicit governmental procedures and structures for land use planning and control, and contain explicit land use judgments which will either be implemented through direct Federal usurpation in a Federal program or mandated upon States to be contained within a State program, and constitute displacement, regulation and altering of the management structure and operation of the traditional area of State sovereignty or integral governmental function of land use planning and control. The foregoing provisions are, therefore, contrary to the Tenth Amendment.

17. All of the above provisions are part of a Federal land use policy of making surface mining an unpreferred land use to underground mining as well as farming, which is expressly set forth on the face of the Act in § 101(b) [30 U.S.C. § 1201(b)], § 102(c) [30 U.S.C. § 1202(c)], 102(k) [30 U.S.C. § 1202(k)], and § 522 [30 U.S.C. § 1272], as well as in § 515(b)(12) [30 U.S.C. § 1265(b)(12)], which prohibits surface mining near underground mining regardless of prior rights questions. The Interagency Task Force Report establishes that the original prime farmland provisions were based on the assumption that sufficient coal existed which could be mined by the underground method so that surface coal mining was unnecessary. The Report found these provisions were based on "two studies on the effects of surface mining on prime farmlands in Illinois, one of which was funded by the Department of Health, Education, and Welfare, and the other conduct-

ed by Jack Doyle of the Environmental Policy Center" [Report, p. 17], which studies indicated:

> So long as there are deep mineable coal reserves in the quantities found in Illinois, there is no need to gamble away long term productive agricultural capacity at the hand of short-term mining economies. [Report, p. 17.]

18. This policy is a land use control and planning policy which when combined with the express functions of the provisions set forth above makes it even clearer that these provisions are a displacement or regulation of the management structure and operation of the traditional governmental function of the States in the area of land use control and planning and are, therefore, contrary to the Tenth Amendment.

19. Under any balancing requirement, the State interest is paramount. The water pollution control provisions are unaffected. Any adverse substantial effect on interstate commerce which is alleviated by the foregoing provisions is trivial at best, while the harmful effects on land use control and planning for Indiana, as well as the extent of the intrusion, are great.

III.

SUBSTANTIVE DUE PROCESS

(A) *Issues:*

Plaintiffs challenge "the prime farmland provisions" and approximate original contour provision [§ 515(b)(3), 30 U.S.C. § 1265(b)(3)] as violating the due process and equal protection guarantees of the Fifth Amendment. Plaintiffs contend that the absence of variances for the prime farmland provisions, and the absence of variances for the approximate original contour provision for lands within the Midwest, and Indiana in particular, as are provided for mining on steep slopes and mountaintops, constitutes discriminatory, arbitrary, and irrational treatment in violation of the Fifth Amendment, in that there is no legitimate Federal or national interest to be served by or to justify the lack of variances.

The Court's inquiry with respect to the discriminatory or selective nature of the foregoing provisions is whether there is an overriding national interest which justifies the discriminatory treatment, and whether there is a legitimate basis for presuming that the selectivity in application of the provisions is actually intended to serve that interest. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 103, 96 S.Ct. 1895, 1904, 1905, 48 L.Ed.2d 495 (1976). The Court must further determine whether the lack of variances for land within Indiana and the Midwest is rational in light of the purported constitutional end–the alleviation of air or water pollution.

(B) *Findings*:

1. Indiana does not contain mountaintops or steep slopes.

2–3. Findings No. 1 and 2, Part II, are incorporated by reference.

4. The prime farmland and approximate original contour requirements become senseless and tantamount to economic waste where they are not necessary to a postmining land use–as commercial and industrial purposes, residental or housing purposes, or recreational purposes.

(C) *Conclusions*:

1. The lack of variance procedures to the prime farmland provisions, and the limitation of the variance from the approximate original contour requirement [§ 515(b)(3), 30 U.S.C. § 1265(b)(3)] to mining on mountaintops and steep slopes, discriminate against the mining operators and States, as Indiana, within the Midwest which have significant coal reserves under prime farmland and no or few steep slopes or mountaintops.

2. There is no rational basis to support that the discriminatory treatment toward plaintiffs and the States in the Midwest, or that the failure to grant plaintiffs equal variances, furthers a legitimate "national interest." For selective or discriminatory Federal legislation to be valid under the Fifth Amendment, there must be an overriding national interest justifying such difference in treatment, and there must be "a legitimate basis for presuming that the rule was actually intended to serve that interest." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 103, 96 S.Ct. 1895, 1904, 1905, 48 L.Ed.2d 495 (1976). Furthermore, for the provisions to be a lawful exercise of the Commerce Clause power, the rational basis for the discriminatory treatment must be justified by a "substantial and adverse effect on interstate commerce".

3. There is no overriding national interest justifying the lack of variances for the prime farmland and approximate original contour provisions on lands within the Midwest, and particularly Indiana, so as to justify the discriminatory treatment imposed upon plaintiffs and the State of Indiana. The variances provided for the approximate original contour provisions in the case of mining on steep slopes and mountaintops were based upon land use considerations and not on matters related to air or water quality. The failure to provide for such variances in the Midwest, including variances for the prime farmland provisions, demonstrates that Congress considered there to be no higher or better use for lands within the Midwest which is not, however, an overriding national interest, particularly since the regulation of the use of lands within the States is not a legitimate federal interest in the face of the Tenth Amendment.

4. In addition, the prime farmland and approximate original contour provisions are irrational, arbitrary and capricious requirements in situations where they are not reasonably necessary to achieve a particular postmining use–as where the land will be used for commercial and industrial purposes, residental or housing purposes, or recreational purposes. Therefore, the prime farmland and approximate original contour provisions constitute a deprivation of substantive due process in violation of the Fifth Amendment.

## IV.

## TAKING WITHOUT JUST COMPENSATION

(A) *Issues*:

Plaintiff coal companies challenge § 510(d)(1) [30 U.S.C. § 1260(d)(1)] and

§ 519(c)(2) [30 U.S.C. § 1269(c)(2)] which require that to obtain a permit an operator must demonstrate that he has the "technological capability to restore such mined area, within a reasonable time, to equivalent or higher levels of yield as non–mined prime farmland in the surrounding area under equivalent levels of management...," and the bond may not be released on prime farmland until "soil productivity ... has returned to equivalent levels of yield as non–mined land of the same soil type in the surrounding area under equivalent management practices...." Plaintiffs also challenge § 503(a)(2)(C) [30 U.S.C. § 1258(a)(2)(C)] which requires that the pre-mining productivity of the land under high levels of management be set forth as a target level of yield in the reclamation plan. Plaintiff coal companies contend that under the state of the art it is scientifically and technologically impossible to return surface mined prime farmland to equivalent levels of yield where the level of management practice is a "high level of management practice," and therefore, they will be unable to mine coal and their property will be taken without just compensation contrary to the Fifth Amendment taking clause.

Plaintiff coal companies contend that § 522 [30 U.S.C. § 1272], dealing with areas unsuitable for surface mining whereby surface mining could be prevented pursuant to subsections (a), (c) and (d), and, further, where surface mining and surface mining operations are prevented pursuant to § 522(e)(4) and (5) [30 U.S.C. § 1272(e)(4) and (5)], constitute a taking of their property without just compensation in violation of the Fifth Amendment taking clause.

(B) *Findings*:

1. There are no known studies conducted by agricultural schools or other published scientific data which demonstrate that, using the required methods of reclamation for prime farmland, prior levels of yield under high levels of management can be achieved. [Tr. 58.]

2. The research and studies conducted to date demonstrate that, at best, prior pro-ductivity can be achieved only under basic levels of management. The difference between productivity under basic levels of management and high levels of management is approximately one–third. [Tr. 61.] That is, yields obtained under high levels of management are approximately one–third greater than those obtained under basic levels of management.

3. Plaintiff AMAX Coal Company intends to mine on prime farmland in the immediate future. [Plaintiffs' Exhibits 33 and 34.] On each of these pieces of property, plaintiff AMAX Coal Company owns only the coal; it does not own the surface rights. Therefore, unless plaintiff AMAX Coal Company is permitted to mine the prime farmland, it will be deprived of mining the coal which is the only value of the coal, and the sole interest of said plaintiff in the property will be taken. Neither plaintiffs nor any other mine operators can demonstrate that prime farmland can be restored to prior levels of productivity under high levels of management.

(C) *Conclusions*:

1. In mining on prime farmland, the Act requires that such land be reclaimed and restored to equivalent levels of productivity under "high levels of management," at least where such level is the practice in the surrounding area.

2. The Court having concluded as a matter of fact that it is technologically impossible to reclaim prime farmland in a postmining period so that equal or higher levels of yield under high levels of management practice can be achieved, the coal companies will be prevented from mining coal under such land. Coal in Indiana can be owned as a mineral interest and if coal cannot be removed, the mineral interest is destroyed. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

3. Similarly, § 522(a), (c) and (d) [30 U.S.C. § 1272(a), (c) and (d)] provide a procedure to prevent the removal of coal thereby destroying the mineral interest.

4. Sections 522(e)(4) and (5) [30 U.S.C. § 1272(e)(4) and (5)] prohibit the removal of coal and any other activity related to surface coal mining operations in certain areas, again destroying the mineral interest and owner's rights.

5. These sections of the Act do not provide for just compensation through eminent domain proceedings. *Pennsylvania Coal Co., supra.* These sections of the Act are, therefore, contrary to the taking clause of the Fifth Amendment and are unlawful and contrary to the Constitution of the United States.

## V.

### PROCEDURAL DUE PROCESS

(A) *Issues*:

Plaintiffs challenge the constitutionality of § 518(c) [30 U.S.C. § 1268(c)] of the Act, which requires persons charged with a violation of the Act, regulations or permit condition to prepay the full amount of the proposed penalty for such alleged violation as a condition precedent to contesting either the fact of the violation or the amount of the proposed penalty. Plaintiffs contend that such forced prepayment of penalty violates the procedural due process requirement of the Fifth Amendment.

The Court's inquiry is whether persons charged with a violation of the Act, regulations or permit condition are afforded a prior opportunity to be heard before their property (the proposed monetary penalty) is taken from them. *Fuentes v. Shevin*, 407 U.S. 67, 96, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972). If such is not the case, the Court must further inquire as to whether there is a valid governmental interest that justifies postponing the hearing until after such property is taken. *See Boddie v. Connecticut*, 401 U.S. 371, 378–79, 91 S.Ct. 780, 786–787, 28 L.Ed.2d 113 (1971).

(B) *Conclusions*:

1. Section 518 [30 U.S.C. § 1268] of the Act provides for the assessment of civil penalties against any mining operator who violates any permit condition or provision of the Act or regulations, which penalties can be as much·as $5,000 per day for each such violation. Pursuant to § 518(c) [30 U.S.C. § 1268(c)], any operator charged with a penalty may contest either the amount of the penalty or the fact of a violation only by prepaying in full the amount of the proposed penalty. The failure to prepay such amount results in a waiver of all legal rights to contest the violation or the amount of the penalty.

2. All district courts which have addressed the issue have held that § 518(c) [30 U.S.C. § 1268(c)] violates the procedural due process guarantees of the Fifth Amendment. *See Virginia Surface Mining and Reclamation Ass'n, Inc. v. Andrus*, (W.D. Va.1980), 483 F.Supp. 425, at 448; *Star Coal Co. v. Andrus*, No. 79–171–2 (S.D.Iowa Feb. 13, 1980), slip op. at 19 (hearing on motion for preliminary injunction).

3. Section 518(c) [30 U.S.C. § 1268(c)] of the Act violates the due process clause of the Fifth Amendment contrary to *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). In the situations encompassed by § 518(c) [30 U.S.C. § 1268(c)], there are no extraordinary circumstances with a valid governmental interest at stake so as to justify the requirement of prepaying the full amount of the proposed penalty in escrow in order to be entitled to a hearing on the fact of a violation or the amount of the proposed penalty, or to justify the requirement that the failure to prepay such amount in full constitutes a waiver of all legal rights to contest the same. *See Boddie v. Connecticut*, 401 U.S. 371, 378–79, 91 S.Ct. 780, 786–787, 28 L.Ed.2d 113 (1971).

4. The administrative procedure providing for an informal conference before the assessment of the proposed penalty [30] the sections of the Act set forth in Paragraphs 1, 2, or 3 hereof.

ALL OF WHICH IS ORDERED, ADJUDGED AND DECREED by the Court this 10th day of June, 1980.

### ORDER AND JUDGMENT

This Court having previously made its Findings of Fact and Conclusions of Law, the Court now renders its judgment.

IT IS HEREBY ORDERED, ADJUDGED AND DECLARED that:

1. The following provisions of the 1977 Surface Mining Control and Reclamation Act, P.L. 95–87, 30 U.S.C. §§ 1201 *et seq.* [hereinafter the Act] are not within any powers delegated to Congress pursuant to the Constitution of the United States and are therefore unlawful as being contrary to the Constitution, and such provisions are contrary to the Tenth Amendment, even if they are an exercise of the Commerce Clause power, and are, therefore, further unlawful as contrary to the Constitution:

(a) § 507(b)(16) [30 U.S.C. § 1257(b)(16)];

(b) § 701(20) [30 U.S.C. § 1291(20)];

(c) § 508(a)(2), (3), (4), (8) and (10) [30 U.S.C. § 1258(a)(2), (3), (4), (8) and (10)];

(d) § 510(d)(1) [30 U.S.C. § 1260(d)(1)];

(e) § 515(b)(7) [30 U.S.C. § 1265(b)(7)];

(f) § 515(b)(19) [30 U.S.C. § 1265(b)(19)] insofar as that portion which provides ". . . achieve the approved postmining land use plan . . .";

(g) § 515(b)(20) [30 U.S.C. § 1265(b)(20)], as to that portion which provides, "when the regulatory authority approves a long–term intensive agricultural postmining land use" and further that portion "when the regulatory authority issues a written finding approving a long–term, intensive, agricultural postmining land use as part of the mining and reclamation plan . . .;", and any other part which requires any post–mining land use;

(h) § 519(c)(2) [30 U.S.C. § 1269(c)(2)], as to that portion which provides ". . . until soil productivity for prime farm lands has returned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices";

(i) § 515(b)(3) [30 U.S.C. § 1265(b)(3)];

(j) § 515(b)(5) [30 U.S.C. § 1265(b)(5)];

(k) § 522(a), (c), (d), (e)(4) and (5) [30 U.S.C. § 1272(a), (c), (d), (e)(4) and (5)]; and

(*l*) § 510(b)(1) and (2) [30 U.S.C. § 1260(b)(1) and (2)] to the extent that it requires that a permit application be denied or approved depending on approval of the postmining land use or of any change in postmining land use from the premining land use.