HODEL, ACTING SECRETARY OF THE INTERIOR,
ET AL. *v.* INDIANA ET AL.

No. 80–231.   Argued February 23, 1981—Decided June 15, 1981

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring statement, *ante,* p. 305. REHNQUIST, J., filed an opinion concurring in the judgment, *ante,* p. 307.

*Peter Buscemi* argued the cause for appellants. With him on the brief were *Solicitor General McCree, Acting Assistant Attorney General Sagalkin,* and *Michael A. McCord.*

*G. Daniel Kelley, Jr.,* argued the cause for appellees. With him on the brief were *Theodore L. Sendak,* Attorney General of Indiana, *Linley E. Pearson,* Attorney General-Elect, *Jack R. O'Neill,* Deputy Attorney General, *Harry T. Ice,* and *Byron L. Myers.**

---

*\*Norman L. Dean, Jr.,* filed a brief for the National Wildlife Federation et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Alaska et al. by *Wilson L. Condon,* Attorney General of Alaska, *Wayne Minami,* Attorney General of Hawaii, and *Johnson H. Wong,* Deputy Attorney General, *David H. Leroy,* Attorney General of Idaho, *Steven L. Beshear,* Attorney General of Kentucky, *William J. Guste, Jr.,* Attorney General of Louisiana, and *Gary L. Keyser* and *Carmack M. Blackmon,* Assistant Attorneys General, *Paul L. Douglas,* Attorney General of Nebraska, and *Judy K. Hoffman,* Assistant Attorney General, *Jeff Bingaman,* Attorney General of New Mexico, *Jan Eric Cartwright,* Attorney General of Oklahoma, *Dennis J. Roberts II,* Attorney General of Rhode Island, *Mark V. Meierhenry,* Attorney General of South Dakota, and *Robert B. Hansen,* Attorney General of Utah; for the State of Arizona et al. by *Robert C. Corbin,* Attorney General of Arizona, *Wayne Minami,* Attorney General of Hawaii, and *Johnson H. Wong,* Deputy Attorney General, *Richard H. Bryan,* Attorney General of Nevada, *Larry D. Struve,* Chief Deputy Attorney General, and *Harry W. Swainston,* Deputy Attorney General, *Allen I. Olson,* Attorney General of North Dakota, and *Ray Walton,* Special Assistant Attorney General, *James M. Brown,* Attorney General of Oregon, *Robert B. Hansen,* Attorney General of Utah, *Slade*

JUSTICE MARSHALL delivered the opinion of the Court.

This appeal, like *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* p. 264, also decided today, involves a broad constitutional challenge to numerous important provisions of the Surface Mining Control and Reclamation Act of 1977, 91 Stat. 445, 30 U. S. C. § 1201 *et seq.* (1976 ed., Supp. III) (Surface Mining Act or Act). Many of the specific provisions attacked in this case, however, differ from the "steepslope" provisions that were the primary focus of the challenge in *Virginia Surface Mining.* The United States District Court for the Southern District of Indiana ruled that the provisions of the Act challenged here are unconstitutional and permanently enjoined their enforcement. 501 F. Supp. 452 (1980). We noted probable jurisdiction *sub nom. Andrus* v. *Indiana,* 449 U. S. 816 (1980), and we now reverse.

# I

## A

The basic structure of the Surface Mining Act is described in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,*

---

*Gorton,* Attorney General of Washington, and *John D. Troughton,* Attorney General of Wyoming; for the State of Illinois by *Tyrone C. Fahner,* Attorney General, and *Harvey M. Sheldon;* for the State of Iowa by *Thomas J. Miller,* Attorney General, and *Elizabeth M. Osenbaugh,* Assistant Attorney General; for the State of Maryland by *Stephen H. Sachs,* Attorney General, and *Thomas A. Deming* and *Michael J. Sibinicio II,* Assistant Attorneys General; for the State of Texas by *Mark White,* Attorney General, *John W. Fainter, Jr.,* First Assistant Attorney General, *Richard E. Gray III,* Executive Assistant Attorney General, and *Justin Andrew Kever,* Assistant Attorney General; for the Mid-America Legal Foundation by *John M. Cannon;* for the Mountain States Legal Foundation by *Roger J. Marzulla;* for the National Coal Association et al. by *John A. MacLeod,* and *Richard McMillan, Jr.;* and for the National League of Cities et al. by *Ross D. Davis, Robert K. Corbin,* Attorney General of Arizona, *Robert T. Stephen,* Attorney General of Kansas, and *Bruce Eugene Miller,* Deputy Attorney General, and *David L. Wilkinson,* Attorney General of Utah.

*ante,* at 268–272, and it will therefore suffice here to briefly describe the specific provisions drawn into question in this case. Several of the challenged sections of the Act are known collectively as the "prime farmland" provisions. These sections establish special requirements for surface mining operations conducted on land that both qualifies as prime farmland under a definition promulgated by the Secretary of Agriculture and has historically been used as cropland within the meaning of the regulations of the Secretary of the Interior (Secretary) implementing the Surface Mining Act. § 701 (20), 30 U. S. C. § 1291 (20) (1976 ed., Supp. III).[1] A permit for surface coal mining on such lands may be granted only if the mine operator can demonstrate its "technological capability to restore such mined area, within a reasonable time, to equivalent or higher levels of yield as nonmined prime farmland in the surrounding area under equivalent levels of management . . . ." § 510 (d)(1), 30 U. S. C. § 1260 (d)(1) (1976 ed., Supp. III). The operator must also show

---

[1] Section 701 (20), 91 Stat. 517, 30 U. S. C. § 1291 (20) (1976 ed., Supp. III), provides that

"the term 'prime farmland' shall have the same meaning as that previously prescribed by the Secretary of Agriculture on the basis of such factors as moisture availability, temperature regime, chemical balance, permeability, surface layer composition, susceptibility to flooding, and erosion characteristics, and which historically have been used for intensive agricultural purposes, and as published in the Federal Register."

The Secretary of Agriculture's definition is found at 7 CFR pt. 657 (1980), and is incorporated into the Secretary of the Interior's regulations implementing the Act by 30 CFR § 701.5 (1980). The Secretary published regulations defining "prime farmland" for purposes of the Act's interim phase. The United States District Court for the District of Columbia remanded the regulations to the Secretary for reconsideration on grounds not pertinent here. See *In re Surface Mining Regulation Litigation,* 456 F. Supp. 1301, 1312 (1978), rev'd in part on other grounds, 201 U. S. App. D. C. 360, 627 F. 2d 1346 (1980). The Secretary has published proposed new regulations defining "prime farmland" for purposes of the interim program. See 44 Fed. Reg. 33625 (1979).

that it can "meet the soil reconstruction standards" for prime farmland set forth in § 515 (b)(7), 30 U. S. C. § 1265 (b)(7) (1976 ed., Supp. III). That section specifies that the distinct soil layers on prime farmland must be separately removed, segregated, stockpiled, and then properly replaced and re-graded. Furthermore, § 519 (c)(2), 30 U. S. C. § 1269 (c)(2) (1976 ed., Supp. III), provides that upon its completion of mining activities on prime farmland, a mine operator can have its performance bond released only on a showing that soil productivity "has returned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices . . . ." [2]

Also challenged here are some of the Act's more general provisions that are applicable throughout the country. These include § 515 (b)(3), which requires restoration of mined land to its approximate original contour,[3] and the directive in § 515 (b)(5), 30 U. S. C. § 1265 (b)(5) (1976 ed., Supp. III), that surface mine operators remove topsoil separately during mining activities and preserve it for use during reclamation if it is not to be replaced immediately on the backfill area of the mining cut. Section 508, 30 U. S. C. § 1258 (1976 ed., Supp. III), requires applicants for surface coal mining permits to submit proposed reclamation plans specifying the intended postmining use of the land and the method by which that use will be achieved. In addition, §§ 522 (a), (c), (d), 30 U. S. C. §§ 1272 (a), (c), (d) (1976 ed., Supp. III), require States wishing to assume permanent

---

[2] Under § 509 of the Act, 30 U. S. C. § 1259 (1976 ed., Supp. III), no mining permits may be issued until the operator has filed a performance bond with the appropriate regulatory authority.

[3] Section 515 (b)(3) describes the "approximate original contour" requirement applicable generally to surface mining operations. Appellees in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* p. 264, challenged the approximate-original-contour provision in § 515 (d) of the Act, which is applicable only to surface mining operations on steep slopes.

regulatory authority over surface coal mining to establish an administrative procedure for determining whether particular lands are unsuitable for some or all kinds of surface mining.[4] Section 522 (e), 30 U. S. C. § 1272 (e) (1976 ed., Supp. III), proscribes mining activity within 100 feet of roadways and cemeteries or within 300 feet of public buildings, schools, churches, public parks, or occupied dwellings. Finally, the Act's procedures for collecting proposed civil penalties contained in § 518 (c), 30 U. S. C. § 1268 (c) (1976 ed., Supp. III), are also drawn into question here.

## B

These suits were filed in August 1978, one by the State of Indiana and several of its officials, and the other by the Indiana Coal Association, several coal mine operators, and others. The complaints alleged that the Act contravenes the Commerce Clause, the equal protection and due process guarantees of the Due Process Clause of the Fifth Amendment, the Tenth Amendment, and the Just Compensation Clause of the Fifth Amendment.

The District Court held a 1-day hearing on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss, and the court ultimately decided the case on the merits without taking further evidence. On June 10, 1980, the District Court issued an order and opinion sustaining each of plaintiffs' constitutional challenges and permanently enjoining the Secretary from enforcing the challenged sections of the Act. 501 F. Supp. 452 (SD Ind. 1980).[5]

---

[4] The progress of the States in submitting proposed permanent regulatory programs under § 503 of the Act and the Secretary's response to those submissions is described in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 272, n. 7. The proposed program submitted by Indiana was approved in part and disapproved in part. See 45 Fed. Reg. 78482 (1980).

[5] On July 2, 1980, JUSTICE STEVENS stayed the District Court's judgment pending final disposition of this appeal.

## II

The District Court gave two rationales for its decision on the Commerce Clause issue. The court first held that the six "prime farmland" provisions [6] are beyond congressional power to regulate interstate commerce because they are "directed at facets of surface coal mining which have no substantial and adverse effect on interstate commerce." *Id.*, at 460. The court reached this conclusion by examining statistics in the Report of the Interagency Task Force on the Issue of a Moratorium or a Ban on Mining in Prime Agricultural Lands (1977) (Interagency Report). [7] These statistics com-

---

[6] The six are:

(1) § 507 (b) (16), 30 U. S. C. § 1257 (b) (16) (1976 ed., Supp. III), which requires a "soil survey" of suspected prime farmlands "to confirm the exact location of such prime farmlands, if any";

(2) § 508 (a) (2) (C), 30 U. S. C. § 1258 (a) (2) (C) (1976 ed., Supp. III), which directs a mine operator to include in its reclamation plan information about "the productivity of land prior to mining, including appropriate classification as prime farm lands, as well as the average yield of food, fiber, forage, or wood products from such lands obtained under high levels of management";

(3) § 510 (d) (1), 30 U. S. C. § 1260 (d) (1) (1976 ed., Supp. III), which allows permits to be issued for mining on prime farmland only when the regulatory authority is satisfied that the operator "has the technological capability to restore such mined area, within a reasonable time, to equivalent or higher levels of yield as non-mined prime farmland in the surrounding area under equivalent levels of management and can meet the soil reconstruction standards in Section 515 (b) (7). . . .";

(4) § 515 (b) (7), 30 U. S. C. § 1265 (b) (7) (1976 ed., Supp. III), which requires the separate removal and replacement of the A, B, and C soil horizons of prime farmland;

(5) § 515 (b) (20), insofar as it authorizes regulatory authorities to approve "long-term, intensive, agricultural postmining land use"; and

(6) § 519 (c) (2), 30 U. S. C. § 1269 (c) (2) (1976 ed., Supp. III), which provides that performance bonds for mining on prime farmland may not be released "until soil productivity for prime farm lands has returned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices . . . ."

[7] The Interagency Report was submitted to the House Committee on

pared the prime farmland acreage being disturbed annually by surface mining to the total prime farmland acreage in the United States. The Interagency Report stated that approximately 21,800 acres of prime farmland were being disturbed annually and that this acreage amounted to 0.006% of the total prime farmland acreage in the Nation. 501 F. Supp., at 459. This statistic and others derived from it, together with similar comparisons for Indiana, persuaded the court that surface coal mining on prime farmland has "an infinitesimal effect or trivial impact on interstate commerce." *Id.*, at 458.[8]

With respect to the other 15 substantive provisions which apply to surface mining generally,[9] the District Court rea-

---

Interior and Insular Affairs in April 1977, one month after the Committee completed hearings on the proposed surface mining legislation. See 501 F. Supp. 452, 459 (SD Ind. 1980).

[8] The court noted that it would take 166 years for surface mining to disturb 1% of the total prime farmland in the country. The court also noted that in 1977 the Government's Agricultural Stabilization and Conservation Service paid farmers not to grow crops on 5,900,000 acres, which is 200 times the prime farmland acreage disturbed annually by surface mining. With respect to Indiana, the court pointed out that only 40,000 acres of prime farmland are projected to be disturbed by surface mining in Indiana in the next 20 years, and that this figure amounts to 0.003% of the total prime farmland in Indiana. *Id.*, at 459–460. In addition, the court noted that in 1977, the Government paid Indiana farmers not to farm 369,153 acres, nearly 1,000% more land than would be affected by surface mining in Indiana in the next 20 years. *Id.*, at 460.

[9] These provisions are:

(1) § 515 (b)(3), 30 U. S. C. § 1265 (b)(3) (1976 ed., Supp. III), requiring restoration of surface mined land to its approximate original contour;

(2) § 515 (b)(5), 30 U. S. C. § 1265 (b)(5) (1976 ed., Supp. III), requiring separate removal, segregation, and ultimate replacement of topsoil on mined land;

(3) §§ 522 (a), (c), (d), (e)(4), (e)(5), 30 U. S. C. §§ 1272 (a), (c), (d), (e)(4), (e)(5) (1976 ed., Supp. III), requiring permanent regulatory programs to establish procedures for designating particular lands as unsuit-

soned that the only possible adverse effects on interstate commerce justifying congressional action are air and water pollution and determined that these effects are adequately addressed by other provisions of the Act. The court therefore concluded that these 15 provisions as well as the 6 prime farmland provisions "are not directed at the alleviation of water or air pollution, to the extent that there are [any] such effects, and are not means reasonably and plainly adapted to [the legitimate end of] removing any substantial and adverse effect on interstate commerce." *Id.*, at 461. We find both of the District Court's rationales untenable.

It is established beyond peradventure that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality . . . ." *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 15 (1976). See also *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 83–84 (1978). A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate com-

---

able for surface mining, and restricting surface mining within a specified radius of certain facilities;

(4) §§ 508 (a)(2), (3), (4), (8), (10), 30 U. S. C. §§ 1258 (a)(2), (3), (4), (8), (10) (1976 ed., Supp. III), requiring that reclamation plans be submitted as part of permit applications under the permanent regulatory program, including descriptions of the premining use of the affected land, the proposed postmining use, and the methods by which the proposed use will be achieved;

(5) §§ 510 (b)(1), (2), 30 U. S. C. §§ 1260 (b)(1), (2) (1976 ed., Supp. III), the general provisions governing approval or disapproval of permit applications under the permanent regulatory program (invalidated to the extent that they entail regulatory authority review of proposed postmining land uses); and

(6) §§ 515 (b)(19), (20), 30 U. S. C. §§ 1265 (b)(19), (20) (1976 ed., Supp. III), requiring maintenance of revegetation of mined lands for a 5- or 10-year period after completion of mining (invalidated to the extent that they may incorporate a requirement of compliance with a postmining land-use plan approved by the regulatory authority).

merce, or that there is no reasonable connection between the regulatory means selected and the asserted ends. *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 276; *Katzenbach* v. *McClung,* 379 U. S. 294, 303–304 (1964); *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 258, 262 (1964). We are not convinced that the District Court had reliable grounds to reach either conclusion in this case.

In our view, Congress was entitled to find that the protection of prime farmland is a federal interest that may be addressed through Commerce Clause legislation. The Interagency Report provides no basis for the District Court's contrary view. That report dealt only with the question whether a complete moratorium or ban on surface coal mining on prime farmland was advisable as a matter of policy. The report neither purported to examine the full impact of surface mining on interstate commerce in agricultural commodities, nor concluded that the impact is too negligible to warrant federal regulation.[10] More important, the court below incorrectly assumed that the relevant inquiry under the rational-basis test is the volume of commerce actually affected by the regulated activity. This Court held in *NLRB* v. *Fainblatt,* 306 U. S. 601, 606 (1939), that "[t]he power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small." The pertinent inquiry therefore is not how much commerce is involved but whether Congress could rationally conclude that the regulated activity affects interstate commerce. See

---

[10] As explained in the Report of the House Committee, Congress followed the recommendation of the Interagency Report, and rejected a Carter administration proposal for a 5-year moratorium on surface mining on prime farmlands. The Committee explained that Soil Conservation Service officials testified that mined prime farmland could be restored to its original productivity levels through compliance with the prime farmland provisions now contained in the Act. H. R. Rep. No. 95–218, pp. 184–185 (1977).

*Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,*
*ante,* at 276–277; *Perez* v. *United States,* 402 U. S. 146, 154–
156 (1971); *Katzenbach* v. *McClung, supra,* at 303–304;
*Wickard* v. *Filburn,* 317 U. S. 111, 127–129 (1942). Cf. *Polish*
*National Alliance* v. *NLRB,* 322 U. S. 643, 648 (1944);
*United States* v. *Darby,* 312 U. S. 100, 123 (1941).[11]

Against this background, we have little difficulty in con-
cluding that the congressional finding in this case satisfies
the rational-basis test. The Senate considered information
from the Interagency Report about the prime farmland acre-
age that might be affected by surface coal mining. See 123
Cong. Rec. 15713 (1977) (remarks of Sen. Percy). In addi-
tion, Senator Percy called the Senate's attention to testimony
presented at the Senate Committee hearings about the losses
in agricultural productivity attributable to surface mining.[12]
*Id.,* at 15713–15717. See also *id.,* at 15720–15721 (remarks
of Sen. Humphrey), 15721 (remarks of Sen. Stevenson).
Similar evidence was presented during the contemporaneous
hearings before the House Committee,[13] and the Committee

---

[11] In any event, the District Court's "finding" that only an insignificant
amount of interstate commerce is affected by surface mining on prime
farmland is questionable. The court noted that the 21,800 acres of prime
farmland disturbed annually by surface mining would have produced about
0.04% of the Nation's total corn production in the 1976–1977 crop year.
See 501 F. Supp., at 459. Although this percentage may seem small, it
is worth remembering that corn production for grain in that year was
6.4 billion bushels, worth some $12.9 billion. See United States Depart-
ment of Agriculture, Agricultural Statistics 30 (1979). Therefore, the
0.04% of corn production would have had an approximate value of $5.16
million which surely is not an insignificant amount of commerce.

[12] See Surface Mining Control and Reclamation Act of 1977: Hear-
ings on S. 7 before the Subcommittee on Public Lands and Resources of
the Senate Committee on Energy and Natural Resources, 95th Cong., 1st
Sess., 775–811 (1977) (Senate Hearings).

[13] See Surface Mining Control and Reclamation Act of 1977: Hearings
on H. R. 2 before the Subcommittee on Energy and the Environment

Report referred to this testimony in explaining the origins of the "prime farmland" provisions. The Report stated:

> "The Committee heard testimony from citizens and local officials of Illinois and Indiana requesting that special attention be given in the bill to the protection of prime agricultural lands. Working with officials of the Soil Conservation Service, the Committee added a number of provisions to H. R. 2 designed to insure the proper reconstruction of soil strata within those areas classified as prime agricultural lands." H. R. Rep. No. 95–218, p. 184 (1977).

In our judgment, the evidence summarized in the Reports mandates the conclusion that Congress had a rational basis for finding that surface coal mining on prime farmland affects interstate commerce in agricultural products. As we explained in *Stafford* v. *Wallace,* 258 U. S. 495, 521 (1922):

> "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of danger and meet it. This court will certainly not substitute its judgment for that of Congress unless the relation of the subject to interstate commerce and its effect upon it are clearly non-existent."

The court below improperly substituted its judgment for the congressional determination.[14]

---

of the House Committee on Interior and Insular Affairs, 95th Cong., 1st Sess., pt. 4, pp. 16–31, 78–92, 159–172, 235–260 (1977) (House Hearings).

[14] Contrary to the District Court's conclusion, it is irrelevant that the Federal Government has in the past paid farmers to refrain from growing crops on certain lands. Such subsidies serve independent goals related to the pricing of agricultural commodities. More important, the affected lands are kept out of production only temporarily, whereas Congress found that unregulated surface mining can be expected to cause long-term or irreversible soil damage.

We also conclude that the court below erred in holding that the prime farmland and 15 other substantive provisions challenged by appellees are not reasonably related to the legitimate goal of protecting interstate commerce from adverse effects attributable to surface coal mining. The court incorrectly assumed that the Act's goals are limited to preventing air and water pollution. As we noted in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 277–280, Congress was also concerned about preserving the productive capacity of mined lands and protecting the public from health and safety hazards that may result from surface coal mining. All the provisions invalidated by the court below are reasonably calculated to further these legitimate goals.[15]

For example, the approximate-original-contour requirement in § 515 (b)(5) is designed to avoid the environmental and other harm that may result from unreclaimed or improperly restored mining cuts.[16] As the Senate Committee Report explained:

"If surface mining and reclamation are not done care-

_____

[15] Even if the District Court was correct in assuming that the Act's sole purpose is controlling air and water pollution that may be caused by surface mining, the court's conclusion that the challenged provisions bear no relation to achievement of this goal would nonetheless be questionable. Along with other provisions of the Act addressing these problems, the provisions at issue contribute to this end. The approximate-original-contour and topsoil replacement requirements, for example, are designed to prevent erosion and sedimentation and thus help preserve water quality. These requirements were among the remedial measures specifically recommended to the House Committee by the United States Army Corps of Engineers for the prevention of further adverse surface mining effects on the Nation's water resources. See House Hearings, pt. 2, at 86.

[16] A representative of the United States Army Corps of Engineers testified at the 1977 House hearings that a National Strip Mine Study prepared by the Corps found that more than 4,400,000 acres of land in the United States have already been disturbed by surface mining and that

fully, significant environmental damage can result. In addition, unreclaimed or improperly reclaimed surface coal mines pose a continuing threat to the environment, and at times are a danger to public health and safety, public or private property." S. Rep. No. 95–128, p. 50 (1977).

See also *id.*, at 83; H. R. Rep. No. 95–218, *supra*, at 79–80, 93. The same is true of § 508's requirement that applicants for surface mining permits under the permanent program must inform the regulatory authority of the intended postmining use for the land and the manner in which such use will be achieved. This requirement was among the remedial actions specifically recommended to the House Committee by the United States Army Corps of Engineers. The Corps recommended "[a]dvanced submission of mining and reclamation plans to a responsible government agency having authority to grant or deny approval to engage in mining, based upon the information in the plans and the requirements of the regulations." House Hearings, pt. 2, at 86. These requirements obviously enable the regulatory authority to ascertain, before mining begins, whether the prospective mine operator has given adequate consideration to the postmining fate of the land, and whether the operator possesses the technological capability to restore the land in the manner proposed.

Similarly, the relevance of the topsoil-replacement requirement in § 515 (b)(5) to the congressional goal of preserving the productive capacity of mined land should be self-evident. See H. R. Rep. No. 95–218, *supra*, at 106–109. Again, this measure was included among the Corps of Engineers' recom-

---

1,900,000 of those acres have not been reclaimed. He further testified that, according to the study, the annual rate of land disturbance by surface mining was 153,000 acres in 1964, and 207,000 acres in 1974. House Hearings, pt. 2, at 69, 83, 90–95. See also S. Rep. No. 95–128, p. 50 (1977).

mendations to the House Committee. The Corps spokesman advised the Committee to require "[s]egregation and preservation of topsoils during, or preceding, mining operations . . . [in order] to provide soil conditions conducive to rapid revegetation after mining . . . ." House Hearings, pt. 2, at 86. Section 522 (e)'s prohibition against mining near churches, schools, parks, public buildings, and occupied dwellings is plainly directed toward ensuring that surface coal mining does not endanger life and property in coal mining communities.

Congress adopted the Surface Mining Act in order to ensure that production of coal for interstate commerce would not be at the expense of agriculture, the environment, or public health and safety, injury to any of which interests would have deleterious effects on interstate commerce. See 30 U. S. C. § 1202 (f) (1976 ed., Supp. III); S. Rep. No. 95–128, *supra,* at 49–53; H. R. Rep. No. 95–218, *supra,* at 57–60. Moreover, as noted in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 281–282, the Act reflects the congressional goal of protecting mine operators in States adhering to high performance and reclamation standards from disadvantageous competition with operators in States with less rigorous regulatory programs. See 30 U. S. C. § 1201 (g) (1976 ed., Supp. III). The statutory provisions invalidated by the District Court advance these legitimate goals, and we conclude that Congress acted reasonably in adopting the regulatory scheme contained in the Act.[17]

[17] Appellees contend that a number of the specific provisions challenged in this case cannot be shown to be related to the congressional goal of preventing adverse effects on interstate commerce. This claim, even if correct, is beside the point. A complex regulatory program such as established by the Act can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies this test. See *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 262 (1964);

## III

The District Court also held that the 21 substantive statutory provisions discussed above violate the Tenth Amendment because they constitute "displacement or regulation of the management structure and operation of the traditional governmental function of the States in the area of land use control and planning . . . ." 501 F. Supp., at 468. The District Court ruled that the real purpose and effect of the Act is land-use regulation, which, in the court's view, is a traditional state governmental function. The court below, like the District Court in *Virginia Surface Mining,* relied for its Tenth Amendment analysis on this Court's decision in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976).

For the reasons stated in our opinion in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 286–293, we hold that the District Court erred in concluding that the challenged provisions of the Act contravene the Tenth Amendment. Like the provisions challenged in *Virginia Surface Mining,* the sections of the Act under attack in this case regulate only the activities of surface mine operators who are private individuals and businesses, and the District Court's conclusion that the Act directly regulates the States as States is untenable. This Court's decision in *National League of Cities* simply is not applicable to this case.[18]

---

*Katzenbach* v. *McClung,* 379 U. S. 294, 303–304 (1964). Cf. *Perez* v. *United States,* 402 U. S. 146, 154–156 (1971); *Wickard* v. *Filburn,* 317 U. S. 111, 127–128 (1942); *United States* v. *Darby,* 312 U. S. 100, 123 (1941).

[18] We also do not share the view of the District Court that the Surface Mining Act is a land-use measure after the fashion of the zoning ordinances typically enacted by state and local governments. The prime farmland and other provisions at issue in this case are concerned with regulating the conditions and effects of surface coal mining. Any restrictions on land use that may be imposed by the Act are temporary and incidental to these primary purposes. The Act imposes no restrictions on postreclamation use of mined lands.

## IV

The District Court next held that the prime farmland and approximate-original-contour provisions of the Act violate the equal protection and substantive due process guarantees of the Fifth Amendment. The court noted that the Act makes no allowance for variances from the prime farmland requirements, and that variances from the approximate-original-contour provisions are available only for steep-slope and mountaintop operations. The court reasoned that the absence of a variance procedure from these statutory requirements impermissibly discriminates against coal mine operators and States in the Midwest, where there are significant coal reserves located under prime farmland and few or no steep-slope or mountaintop mining operations. Relying on this Court's decision in *Hampton* v. *Mow Sun Wong,* 426 U. S. 88 (1976), the court ruled that this discriminatory treatment could not withstand equal protection scrutiny because it is not justified by "an overriding national interest." 501 F. Supp., at 469. The court further held that both the prime farmland and approximate-original-contour provisions "constitute a deprivation of substantive due process" because they are "irrational, arbitrary and capricious requirements in situations where they are not reasonably necessary to achieve a particular postmining use . . . ." *Ibid.*

Although its decision was couched in terms of the arbitrariness of the challenged provisions, we fear that the court below did no more than substitute its policy judgment for that of Congress. Social and economic legislation like the Surface Mining Act that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose. *Schweiker* v. *Wilson,* 450 U. S. 221 (1981); *U. S. Railroad Retirement Board* v. *Fritz,* 449 U. S. 166 (1980). Moreover, such legislation carries with it a presumption of rationality

that can only be overcome by a clear showing of arbitrariness and irrationality. *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S., at 83; *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S., at 15. As the Court explained in *Vance* v. *Bradley,* 440 U. S. 93, 97 (1979), social and economic legislation is valid unless "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." This is a heavy burden, and appellees have not carried it.

Neither the court below nor appellees have identified any instance in which the prime farmland or approximate-original-contour provisions have been applied to a mining operation so as to produce an irrational or arbitrary result. More important, even were appellees correct that the challenged provisions impose a greater burden on mine operators in the Midwest, that is no basis for finding the provisions unconstitutional. A claim of arbitrariness cannot rest solely on a statute's lack of uniform geographic impact. *Secretary of Agriculture* v. *Central Roig Refining Co.,* 338 U. S. 604, 616–619 (1950); *Currin* v. *Wallace,* 306 U. S. 1, 14 (1939). As the Court explained in *Central Roig Refining Co., supra,* at 616:

> "Nor does the Commerce Clause impose requirements of geographic uniformity. . . . Congress may devise . . . a national policy with due regard for the varying and fluctuating interests of different regions."

The characteristics of surface coal mining obviously will vary according to the different geographical conditions present in affected States. Congress has determined that the measures appropriate for steep-slope mines are not necessarily desirable in flatter terrain and prime farmland areas. In allowing variances from the approximate-original-contour requirement applicable to steep-slope mines, Congress may have been influenced by the relative shortage of level land in the steep-

slope areas of the country which does not exist in the flatter terrain areas of the Midwest. Similarly, Congress presumably concluded that allowing variances from the prime farmland provisions would undermine the effort to preserve the productivity of such lands. In our view, Congress acted rationally in drawing these distinctions, and the fact that a particular State has more of one kind of mining operation than another does not establish impermissible discrimination under the Fifth Amendment's Due Process Clause. Furthermore, by invalidating the challenged provisions of the Act under the rubric of "substantive due process," the District Court essentially acted as a superlegislature, passing on the wisdom of congressional policy determinations. In so doing, the court exceeded its proper role. See *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976); *Ferguson* v. *Skrupa*, 372 U. S. 726, 730 (1963).

## V

As did its counterpart in *Virginia Surface Mining*, the District Court here ruled that some of the Act's provisions take private property without just compensation in violation of the Fifth Amendment. The court found fault with three of the prime farmland provisions. One is the provision requiring an operator seeking a permit for mining on such land to show that he has the capacity to restore the land, within a reasonable time after the completion of mining, to at least the productivity levels of "non-mined prime farmland in the surrounding area under equivalent levels of management . . . ." § 510 (d)(1), 30 U. S. C. § 1260 (d)(1) (1976 ed., Supp. III). The second provision conditions the release of a mine operator's performance bond on the completion of this restoration. § 519 (c)(2), 30 U. S. C. § 1269 (c)(2) (1976 ed., Supp. III). The third provision directs mine operators to include information about the premining productivity of the land in the reclamation plans they file as part of "prime farmland" permit applications. § 508 (a)(2), 30

U. S. C. § 1258 (a)(2) (1976 ed., Supp. III). The District Court concluded that these three provisions effect an unconstitutional taking of private property because, in the court's view,

> "it is technologically impossible to reclaim prime farmland in a postmining period so that equal or higher levels of yield under high levels of management practice can be achieved." 501 F. Supp., at 470.

The court also ruled that the requirement in § 522 of a procedure for designating areas unsuitable for mining operations, as well as § 522 (e)'s proscription of mining on certain lands and near particular structures, takes private property without just compensation.

In this case as in *Virginia Surface Mining*, appellees' takings claims do not focus on any particular properties to which the challenged provisions have been applied. Similarly, the District Court's ruling did not pertain to the taking of a particular piece of property or the denial of a mining permit for specific prime farmland operations proposed by appellees.[19] Thus, this case resembles *Virginia Surface Mining* in that the only issue properly before the District Court was whether "mere enactment" of the Surface Mining Act ef-

---

[19] The District Court did find that one of appellee coal companies owns subsurface rights to coal on prime farmland which it "intends to mine . . . in the immediate future." 501 F. Supp., at 470. But even under the District Court's takings analysis, this particular plaintiff's claim is not ripe for judicial determination. For the court held that the Act effects a taking only where it would require a mine operator to demonstrate that it had the capability to restore mined prime farmland to "equal or higher levels of yield under *high levels* of management." *Ibid.* (emphasis added). The court specifically found that mined prime farmland can be restored to the productivity of unmined land under what it described as *"basic levels* of management." *Ibid.* (emphasis added). Since the plaintiff involved did not allege that it was required to demonstrate a capacity to restore the prime farmland to yields under "high levels of management," there could be no basis for the District Court's conclusion that the mine operator's property has been taken by the Act.

fected an unconstitutional taking of private property. For the reasons discussed more fully in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 294–297, we conclude that this question must be answered in the negative.

Like the steep-slope provisions reviewed in *Virginia Surface Mining,* the prime farmland provisions do not prohibit surface mining; they merely regulate the conditions under which the activity may be conducted. The prime farmland provisions say nothing about alternative uses to which prime farmland may be put since they come into play only when an operator seeks to conduct mining operations on the land. We therefore conclude that these provisions do not, on their face, deprive a property owner of economically beneficial use of his property.[20]

## VI

The court below joined the *Virginia Surface Mining* District Court in holding that the Act's civil penalty provisions deprive coal mine operators of their right to due process. However, like their counterparts in *Virginia Surface Mining,* appellees have made no showing that they were ever assessed civil penalties under the Act, much less that the statutory prepayment requirement was ever applied to them or caused

---

[20] The District Court found that "[p]laintiffs coal companies own and/or have rights to and presently intend to mine lands subject to § 522 (e) (4) and/or (5)." *Id.,* at 460. However, in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 296, n. 37, we held that the "mere enactment" of § 522 (e) did not effect an unconstitutional taking of the lands to which its restrictions apply. We rely on our discussion in *Virginia Surface Mining* to dispose of the pertinent claims here. We also hold that here, as in *Virginia Surface Mining,* the District Court erred in ruling on the validity of §§ 522 (a), (c), and (d). These provisions, which require procedures for designating areas unsuitable for mining, do not come into effect until the permanent phase of the program, and they have not been applied to appellees or any other landowners in Indiana. In these circumstances, there is no justiciable case or controversy concerning these sections of the Act. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc., ante,* at 294, n. 36.

them any injury. As in *Virginia Surface Mining,* we hold that appellees' challenge to these provisions is premature.

## VII

Our review of the questions presented by this case leads us to the same conclusion that we reached in *Virginia Surface Mining.* The Surface Mining Act is not vulnerable to appellees' pre-enforcement constitutional challenge. Accordingly, we reverse the judgment of the District Court and remand the case to that court with instructions to dissolve the injunction entered against the Secretary, and for further proceedings consistent with this opinion.

*So ordered.*

[For concurring statement of THE CHIEF JUSTICE, see *ante,* p. 305.]

[For opinion of JUSTICE REHNQUIST concurring in the judgment, see *ante,* p. 307.]