Tom S. ANDERSON,
Petitioner, Appellant,

v.

MEDTRONIC, INC., Respondent.

No. C5–84–1119.

Supreme Court of Minnesota.

Feb. 28, 1986.

Michael T. Nilan, LaRaye M. Osborne, Minneapolis, for appellant.

Terrence M. Frote, Kristin L. Arneson, Minneapolis, for respondent.

AMDAHL, Chief Justice.

This case involves a dispute between plaintiff and his former employer, Medtronic, Inc., over plaintiff's entitlement to a management incentive bonus for his last year of work with the company. A jury found that Medtronic had acted in bad faith in withholding the bonus from plaintiff. The trial court awarded $10,891 in damages plus interest and penalties under Minn.Stat. § 181.13 (1982). It also awarded plaintiff more than $16,000 in attorney fees pursuant to Minn.Stat. § 181.14 (1982). The Court of Appeals reversed and remanded the case to the trial court for a new trial holding that the submission to the jury of Medtronic's bad faith was prejudicial error and Minn.Stat. § 181.14 does not permit recovery of attorney fees. We granted plaintiff's petition for further review and we now reverse in part the opinion of the Court of Appeals and hold that the trial court's submission of Medtronic's bad faith to the jury was not prejudicial error.

Plaintiff began working for Medtronic in 1970 as a sales representative. After sev-

eral promotions, he was given the position of Director of New Ventures in 1977. In connection with this assignment, he, along with other employees, was urged to sign an employee agreement which included a covenant not to compete. The relevant clause in the agreement reads:

5. *Competitive Employment*

(a) During my employment, I will not plan, organize or engage in any business competitive with any product or service marketed or planned for marketing by the Company or conspire with others to do so.

(b) For 360 days after termination of my employment with the Company, I will not attempt to divert any Company business by soliciting, contacting, or communicating with any customers for the Company's products with whom I, or employees under my supervision, had contact during the year preceding termination of my employment.

At the same time, Medtronic initiated a management incentive bonus plan designed to pay high-level employees yearly bonuses based upon the company's profitability and the employee's individual performance. Plaintiff was invited to participate in this plan in both fiscal years 1978 and 1979. In 1979, plaintiff was eligible for a maximum bonus of 24% of his annual salary with 75% of the bonus contingent upon the company's earnings and 25% based on plaintiff's individual work performance. Medtronic reached its corporate goal and it did not refute plaintiff's testimony that he achieved his individual goals. Therefore, if he was entitled to the bonus at all, he would receive the full 24% amount.

In early or mid-1978, plaintiff became dissatisfied with his position as Director of New Ventures. He spoke with his superiors George Heenan and two other company officers about his frustration and they suggested that he apply for certain openings within Medtronic. Plaintiff either was not interested in the positions available or his applications were turned down. His unit personnel manager, Linda Medin, suggested he contact an executive recruiter. In

January 1979, an Atlanta recruiter telephoned plaintiff regarding a possible opening with a French company, ELA Medical, which was looking to open a pacemaker division in the United States. On three separate occasions, plaintiff met with Thierry Hermann, president of ELA, to discuss the venture, but no offers arose from these discussions and plaintiff continued to seek employment within Medtronic.

On March 31, 1979, Heenan told plaintiff that his position as Director of New Ventures was being eliminated effective May 1, 1979. On April 2, plaintiff again met with Heenan and Medin at which time Heenan outlined plaintiff's termination package. He explained that the termination would be treated as a job elimination, plaintiff would receive a 30-day notice, and he would be entitled to his management incentive bonus.

On April 9, plaintiff met with Hermann and began to negotiate in earnest about the position with ELA Medical. Since he was still employed with Medtronic, plaintiff became concerned that he may have a conflict of interest and he notified an attorney in Medtronic's legal department. The attorney advised plaintiff to tell this to his supervisor. Plaintiff then explained his situation to a superior who advised him to leave the office until plaintiff could decide what he would do. In late April, Heenan met with plaintiff and urged him not to accept a position with a competitor. He later sent a letter to plaintiff which outlined the terms of the termination package including his entitlement to the incentive bonus. This letter added a condition not previously discussed: "The above terms assume that you will not take a position which would be a violation of your employment agreement." This was the first indication to plaintiff that Medtronic might withhold his bonus; however, since he had not worked in Medtronic's pacemaker division for well over 12 months, he was not concerned that he

would be violating the employee agreement should he accept the ELA position.

On June 4, 1979, plaintiff accepted Hermann's offer. He was later told that Medtronic's president had decided not to award him the incentive bonus since plaintiff had taken a job with a competitor and the president believed this was a violation of the employee agreement. Medtronic's position is that since plaintiff terminated his position at Medtronic before the end of the fiscal year, his entitlement to the bonus was discretionary with the president of the company.[1] Plaintiff, however, claims that he was not terminated before the end of the fiscal year and he did not violate the employee agreement by accepting the job offer from ELA Medical.

Plaintiff sued Medtronic for breach of contract and for violation of Minn.Stat. § 181.13. Following a jury trial in late 1983, the trial court directed a verdict on the issues of defendant's liability and damages, but submitted to the jury the issues of (1) Medtronic's defense that they had promised to pay plaintiff's bonus on plaintiff's promise not to join a competitor, and (2) Medtronic's bad faith refusal to pay plaintiff's bonus. It appears that this second issue was submitted for the purposes of determining whether defendant should pay attorney fees pursuant to Minn.Stat. § 549.21. The trial court subsequently determined that attorney fees were payable under Minn.Stat. § 181.14 and thus disregarded the jury's determination on the second issue.

The jury found that plaintiff made no misrepresentation regarding becoming employed with a competitor and that Medtronic did act in bad faith in refusing to pay plaintiff's bonus. The trial court entered judgment for plaintiff in the amount of $10,891 in damages plus interest and penalties under Minn.Stat. § 181.13. It also awarded plaintiff more than $16,000 in attorney fees pursuant to Minn.Stat. § 181.-

---

1. The Incentive Plan provides:

Following termination during a Plan Year for any reason other than death, disability, or normal or early retirement, a Participant's eligibility to receive an award for that Plan Year will be determined solely at the discretion of the President.

14. The Court of Appeals reversed and remanded the case to district court for a new trial. *Anderson v. Medtronic, Inc.,* 365 N.W.2d 364, 368 (Minn.App.1985). The court held (1) the submission to the jury of Medtronic's bad faith was prejudicial error, and (2) Minn.Stat. § 181.14 does not permit the recovery of attorney fees. Plaintiff petitioned this court for further review of both issues.

1. At the close of the evidence, the trial court submitted the following interrogatory to the jury: "Did Medtronic act in bad faith by not paying Tom Anderson his Incentive Plan claim?" The Court of Appeals held that the trial court's action constituted prejudicial error. While we agree that it was error to submit this issue to the jury, we disagree with the Court of Appeals' assessment that the error was so prejudicial as to warrant a new trial.

 The trial court could have had one of two purposes in mind by submitting this issue to the jury, both of which involve a decision of whether to award attorney fees. The first purpose would be for a determination of good faith under Minn.Stat. § 549.-21 (1984), which provides:

> Upon motion of a party, the court in its discretion may award to that party costs, disbursements, reasonable attorney fees and witness fees if the party or attorney against whom costs, disbursements, reasonable attorney fees and witness fees are charged acted in bad faith; asserted a claim or defense knowing it to be frivolous; asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass; or committed a fraud upon the court.

The existence of bad faith is a fact issue, *Cherne Industrial, Inc. v. Grounds and Associates,* 278 N.W.2d 81, 97 (Minn.1979); however, it is an issue which must be decided by the trial court, not the jury. *Id.* Section 549.21 is a statutory codification of the common law rule that attorney fees are recoverable where the unsuccessful party has acted in bad faith, vexatiously, or for oppressive reasons. *Barr/Nelson, Inc. v. Tonto's, Inc.,* 336 N.W.2d 46, 53 (Minn.

1983). This rule applies only to situations in which a party acts in bad faith with respect to the litigation itself as opposed to bad faith in the underlying action which is the basis of the suit. *See id.; Minnesota-Iowa Television Co. v. Watonwan T.V. Improvement Association,* 294 N.W.2d 297, 311 (Minn.1980). Thus, the statute is intended to punish individuals who abuse the legal process to harass opponents or delay resolution of a dispute.

The question submitted to the jury in this case concerned Medtronic's bad faith refusal to pay plaintiff a bonus. It did not address any bad faith Medtronic may have exercised in the litigation itself. Thus, this cannot even be characterized as an interrogatory to an advisory jury. The question did not address the proper subject matter for purposes of applying Minn.Stat. § 549.-21.

The only other justification for submitting this interrogatory to the jury would be for the purpose of applying Minn.Stat. § 181.14. At the time plaintiff's cause of action arose, the section read:

> [I]f the employer disputes the amount of wages or commissions claimed by such employee under the provisions of this section or section 181.13, and the employer in such case makes a legal tender of the amount which he *in good faith* claims to be due, he shall not be liable for any sum greater than the amount so tendered and interest thereon at the legal rate, unless, in an action brought in a court having jurisdiction, such employee recovers a greater sum than the amount so tendered with such interest thereon; and if, in such suit, the employee fails to recover a greater sum than that so tendered, with interest as aforesaid, he shall pay the cost of such suit, otherwise the cost thereof shall be paid by the employer * * *.

Minn.Stat. § 181.14 (1980) (emphasis added). Plaintiff contends that this provision requires a finding of either the employer's good faith or bad faith in the amount tendered, or in the fact that the employer refused to tender anything, in order that a

court may determine whether a plaintiff is entitled to receive the costs of the suit from the employer under the statute. Medtronic, on the other hand, argues that the good faith language in section 181.14 relates only to the amount the employer pays into escrow to avoid the statutory penalty and it does not concern a decision to pay nothing. Therefore, the provision does not apply in this case.

We agree with Medtronic. An employer's liability for the cost of the suit depends not on its good faith or bad faith, but rather on whether it tendered a sufficient amount to a plaintiff suing under the chapter. The issue of Medtronic's bad faith is immaterial for purposes of Minn. Stat. § 181.14. Nevertheless, we reverse the Court of Appeals because we disagree with its conclusion that the trial court's error was prejudicial. The issue of Medtronic's bad faith was separate and distinct from the real issue in the case, and we cannot conceive how submitting this issue to the jury could have affected the outcome of the trial. *See Midway Center Associates v. Midway Center, Inc.,* 306 Minn. 352, 357, 237 N.W.2d 76, 78 (1975).

2. The next issue raised is whether the phrase "cost of such suit" as used in Minn.Stat. § 181.14 (1982),[2] comprehends an award of attorney fees. The trial court awarded fees in excess of $16,000, relying on Minn.Stat. § 181.14 (1982) which provides: "[I]f, in such suit, the employee fails to recover a sum greater than that so tendered [by the employer] * * * he shall pay the cost of such suit, otherwise the cost thereof shall be paid by the employer * *." The Court of Appeals reversed the trial court and held that since the statute does not specifically allow attorney fees, it will not be construed to allow them. *Anderson,* 365 N.W.2d at 367. We agree with the Court of Appeals.

The general rule, known as the American Rule, is that attorney fees are not recoverable in litigation unless there is a specific contract or statute authorizing such a recovery. *Barr/Nelson,* 336 N.W.2d at 53. Where Minnesota statutes authorize fees, language such as "attorney fees" or "counsel fees" is employed. *E.g.,* Minn.Stat. §§ 471.44; 549.21 (1984). The term "costs" as used in statutes is not ordinarily understood to include attorney fees. *McRostie v. City of Owatonna,* 152 Minn. 63, 68, 188 N.W. 52, 54 (1922); 1 S. Speiser, Attorneys' Fees § 12:5 (1973).

It is clear, however, that the phrase "cost of such suit" comprehends something more than mere "costs and disbursements." Minn.Stat. § 181.17 (1984) provides that in any employee wage recovery action, "the plaintiff shall be allowed double statutory costs in addition to disbursements allowed by law." To construe "cost of such suit" to mean mere costs and disbursements would render the language in Minn.Stat. § 181.17 superfluous. Since the legislature intends that the entire statute be effective, Minn.Stat. § 645.17(2) (1984), we hold that the proper construction of the "cost of such suit" language in Minn.Stat. § 181.14 is all out-of-pocket expenses reasonably incurred in prosecuting or defending the action not including attorney fees. *See State v. Savage,* 255 N.W.2d 32, 38 (Minn.1977) (similarly construing Minn.Stat. § 117.16 but including attorney fees where statute permits "reasonable costs and expenses including fees of counsel"). This construction conforms to both the American Rule and the general rule of law that penal statutory provisions should be strictly construed. *Otis v. Mattila,* 281 Minn. 187, 199, 160 N.W.2d 691, 700 (1968).

3. The final issue raised by plaintiff is whether this construction of Minn. Stat. § 181.14 denies him equal protection of the law since Minn.Stat. § 181.145 (1984) expressly provides for attorney fees for commission salespersons recovering commissions past due after termination of their employment. Section 181.145 is similar to section 181.14, except that it only applies to

**2.** A 1984 amendment to the statute changed the language to "cost of the suit." Act of April 23, 1984, ch. 446, § 2, 1984 Minn.Laws 161–62.

"commission salespersons." A commission salesperson is "a person who is paid on the basis of commissions for sales and who is not covered by sections 181.13 and 181.14 because he or she is an independent contractor." Minn.Stat. § 181.145, subd. 1 (1984). This section also differs from section 181.14 in that in disputed cases, prevailing commission salespersons can recover "reasonable attorney's fees" from the employer. Minn.Stat. § 181.145, subd. 4(b) (1984).

In cases involving challenges based upon equal protection, the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Center,* — U.S. —, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). More specifically, social and economic legislation which does not employ suspect classifications or impinge on fundamental rights carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. *Hodel v. Indiana,* 452 U.S. 314, 331–332, 101 S.Ct. 2376, 2386–2387, 69 L.Ed.2d 40 (1981). This legislation is valid "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942–943, 59 L.Ed.2d 171 (1979). In addition, a state does not violate the equal protection clause simply because the classification is imperfect or where the classification "is not made with mathematical nicety or because in practice it results in some inequity." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). Thus, the constitution presumes that even improvident decisions will be rectified eventually through the democratic process. *Cleburne,* 105 S.Ct. at 3254.

The legal relationship of an employer and an independent contractor differs from that of an employer and a salaried employee. We can perceive no valid reason why the legislature could not legislate different conditions for regulating prompt payment of compensation for the respective members of two different groups. Accordingly, we hold that the legislation has a rational basis and does not constitute a denial of equal protection.

Affirmed in part and reversed in part.

KELLEY, J., concurs in part, dissents in part.

KELLEY, Justice (concurring in part, dissenting in part).

Although I concur in parts 2 and 3 of the majority decision, I must respectfully dissent from part 1.

I agree with the majority's conclusion that it was error to submit the "bad faith" issue to the jury. As the majority clearly explains, no legitimate reason existed justifying the submission. I do part company with the majority when it finds no prejudice in the submission. My reading of the record leads me to concur with the court of appeals in its holding "that the question concerning bad faith and the correlative instruction prejudiced Medtronic by focusing the jury's attention on an irrelevant and perhaps highly charged emotional issue. Its effect is an improper impression on the jury. The jury, in a sense, was allowed to decide only if Medtronic committed active fraud and if Medtronic acted in bad faith. A new trial is required." *Anderson v. Medtronic,* 365 N.W.2d 364, 367 (Minn.App.1985).