*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0021P (6th Cir.)
File Name: 04a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RACEWAY PARK, INC.;
TOLEDO MAUMEE RACEWAY,
INC.; CEDAR DOWNS OTB,
LTD.; RIVER DOWNS JOCKEY
CLUB, INC.; RIVER DOWNS
TURF CLUB, INC. (02-3466);
MIAMI VALLEY TROTTING,
INC.; LEBANON TROTTING
CLUB, INC. (02-3466/3487),
     *Plaintiffs-Appellants,*

Nos. 02-3466/3487

*v.*

STATE OF OHIO; OHIO STATE
RACING COMMISSION;
NORTHFIELD PARK
ASSOCIATES; THISTLEDOWN,
INC.; SCIOTO DOWNS,
     *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-07720—David A. Katz, District Judge.

Argued: September 17, 2003

Decided and Filed: January 15, 2004

Before: SUHRHEINRICH, COLE, and ROGERS, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** William T. Maloney, MALONEY, McHUGH &
KOLODGY, Toledo, Ohio, John D. Smith, JOHN D. SMITH
CO., L.P.A., Springboro, Ohio, for Appellants. Shawn J.
Organ, JONES DAY, Columbus, Ohio, for Appellees.
**ON BRIEF:** William T. Maloney, MALONEY, McHUGH
& KOLODGY, Toledo, Ohio, John D. Smith, JOHN D.
SMITH CO., L.P.A., Springboro, Ohio, Jack M. Lenavitt,
LENAVITT LAW OFFICES, Toledo, Ohio, for Appellants.
Shawn J. Organ, Ronald E. Laymon, JONES DAY,
Columbus, Ohio, Thomas J. Rocco, OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Columbus, Ohio, Orla
E. Collier III, N. Victor Goodman, BENESCH,
FRIEDLANDER, COPLAN & ARONOFF, Columbus, Ohio,
John J. Chester, Karen S. Hockstad, CHESTER, WILLCOX
& SAXBE, Columbus, Ohio, for Appellees.

_____

## OPINION

_____

ROGERS, Circuit Judge. The instant action arises from the
passage of Substitute House Bill 561 ("HB 561") by the Ohio
General Assembly. 1996 Ohio Laws H 561. HB 561
concerned, in relevant part, the terms under which horse
racing tracks and satellite facilities could receive simulcast
races conducted at other facilities. The plaintiffs — certain
owners of licensed race track facilities located in Cincinnati,
Toledo, and Lebanon, Ohio, and the satellite facility
associated with the Toledo track — sued the Ohio State
Racing Commission, among others, challenging the

constitutionality of certain aspects of HB 561 under the Takings Clause of the Fifth Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The district court granted the defendants' motion for summary judgment, and dismissed the case. Because the statutory scheme does not effectuate a taking for Fifth Amendment purposes, and does not otherwise run afoul of the Fourteenth Amendment, we affirm the judgment of the district court.

*I. Background*

The statutory provisions at issue in this case govern the allocation of proceeds from simulcast horse racing in Ohio. Prior to the enactment of HB 561, wagering at Ohio tracks on televised, simulcast horse races was significantly restricted.[1] Tracks could offer simulcast racing only on days that they also offered a live racing program. Ohio law also prescribed how wagering revenues were allocated. Money wagered at tracks was divided, with a percentage going to the track operator as a "commission" and the balance distributed as payoffs on winning wagers. After taxes and administrative fees were subtracted from the commission, 50% of the balance was allocated to the operator's purse account (which must be used to fund purses at the track) and 50% of the balance was retained by the operator as income. *See* OHIO REV. CODE ANN. § 3769.08 (West 1995).

This scheme for allocating wagering revenues on days on which a track offered both live and simulcast racing was not changed by the passage of HB 561. *See* OHIO REV. CODE ANN. § 3769.08 (Anderson 2002). HB 561, however, authorized tracks to offer simulcast racing on days on which

---

[1] Wagering on horse racing is comprehensively and strictly regulated by the state of Ohio, and such wagering is prohibited unless authorized by a permit issued by the Ohio State Racing Commission.

they offered no live racing program, and provided a separate scheme for allocating wagering revenues from such days. *See generally* OHIO REV. CODE ANN. § 3769.089 (Anderson 2002). The scheme was essentially the same, except that the portion of the commission which had been allocated to the purse fund at the  track was diverted instead into a newly created Combined Simulcast Purse Fund ("CSPF"). OHIO REV. CODE ANN. § 3769.089(E) (Anderson 2002). Funds from the CSPF are distributed periodically to the purse funds at Ohio race tracks in accordance with a formula based on each track's historical share of the total amount wagered on live racing days during the five calendar years immediately preceding the distribution. OHIO REV. CODE ANN. § 3769.089(F) (Anderson 2002). The plaintiffs have each paid more money into the CSPF than they have received in distributions, while the racetrack defendants have each received more money in distributions from the CSPF than they have paid into it.

This case involves the constitutionality not only of the CSPF, but also the so-called "50% Rule" that applies to wagers made at satellite facilities. OHIO REV. CODE ANN. § 3769.26(F) (Anderson 2002). Satellites must be affiliated with a particular race track but conduct no live racing activities themselves. Consequently, a satellite depends entirely on simulcasts of races conducted at other locations. Satellites receive simulcasts from "simulcast hosts," Ohio race tracks that transmit live racing conducted at Ohio tracks or that act as hosts for races taking place in other states.[2]

All money wagered at the simulcast host and all money wagered at satellites is included in a common pari-mutuel pool at the simulcast host and, with limited exceptions not

---

[2] More than one Ohio track can operate as a simulcast host for the same out-of-state race. In such cases, the allocation of money wagered, as described below, is divided equally among the hosting tracks.

relevant here, the payment on winning tickets is the same whether the wager was placed at the simulcast host or at a satellite. OHIO REV. CODE ANN. § 3769.26(E) (Anderson 2002). Under the 50% Rule, 50% of the money wagered at a satellite location is "allocated" to the simulcast host, OHIO REV. CODE ANN. § 3769.26(F) (Anderson 2002), which effectively means that that portion is treated as if it were wagered at the simulcast host for the purposes of determining taxes to be paid and commissions to be retained by the host. The remaining 50% is allocated to the satellite for the purpose of determining taxes to be paid and the commission to be retained by the satellite. The 50-50 allocation is the same whether the simulcast host is transmitting live racing conducted at its track or hosting racing conducted at out-of-state tracks.

The plaintiffs filed a complaint in the district court, alleging that the CSPF and the 50% Rule constituted unconstitutional takings of their property under the Takings Clause of the Fifth Amendment to the United States Constitution, and violated their rights under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. Faced with cross-motions for summary judgment, the district court granted the defendants' motion for summary judgment, denied the plaintiffs' motion for summary judgment, and dismissed the plaintiffs' complaint. The court concluded that, because the CSPF was created by the same legislation that authorized simulcast-only racing, the plaintiffs had no reasonable expectation to receive the revenues diverted to CSPF and, thus, had no property interest in those funds that could be taken in violation of the Takings Clause. The district court further found that the plaintiffs' failure to demonstrate a protectable property interest in the revenues diverted to the CSPF doomed their claims that the creation of the CSPF arbitrarily deprived them of property in violation of the Due Process Clause of the Fourteenth Amendment. Finally, the district court concluded that HB 561 contained no indiscriminate or arbitrary classification, but was "a studied

and well-considered statutory scheme" established to protect and promote live horse racing in Ohio.[3] The plaintiffs filed the instant appeal.

## II. Analysis

Summary judgment is appropriate when the moving party demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, the district court views the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970) (citation omitted). We review a district court's grant of summary judgment *de novo. Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988).

A. *The challenged provisions do not constitute unconstitutional takings of the Plaintiffs' property under the Takings Clause of the Fifth Amendment to the United States Constitution.*

The Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, *Dolan v. City of Tigard*, 512 U.S. 374, 383-84 (1994) (*citing Chicago, Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226, 239 (1897)), provides that private property shall not be taken for public use without just compensation. Even assuming that the plaintiffs have a property interest in the funds diverted under the CSPF or the 50% Rule, however, the operation of those provisions does not constitute an unlawful taking under the Fifth Amendment.

---

[3] In granting summary judgment, the district court did not discuss the plaintiffs claims concerning the 50% Rule.

"Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (*quoting Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Current law does not grant the plaintiffs any property interest to wagering revenues diverted under the CSPF (aside from their rights to distributions under the statutory formula) or the 50% Rule. Accordingly, the inquiry turns to whether the plaintiffs had such an interest prior to the passage of HB 561. It is apparent that they did not.

It is clear that, prior to the enactment of HB 561, the plaintiff race tracks were statutorily entitled to commissions earned from wagering on simulcast racing at their tracks *on days when live racing was also conducted at the tracks*. The race tracks' entitlement to those commissions was not affected by the passage of HB 561 and the establishment of the CSPF. The plaintiffs did not, however, have a statutory entitlement to commissions earned on days when they offered only simulcast racing because, under pre-HB 561 law, no such racing could be conducted. There could therefore have been no property interest in such commissions. It was the passage of HB 561 that created the right to conduct simulcast-*only* racing in Ohio, and, therefore, any property rights to commissions on such racing could not pre-date the passage of HB 561.

Nor did the plaintiffs have a property interest in the revenues diverted under the 50% Rule prior to the passage of HB 561. While the plaintiffs generally assert that "the mere fact that an activity is pursued under an authorization or license obtained by the government does not mean that licensees have no property interest in the fruits of their labors," and that they have a property interest "in funds generated though the conduct of a licensed business activity—the simulcasting of horse racing events," they do not identify any specific pre-HB 561 property interest that is affected by the 50% Rule.

It follows that funds diverted by HB 561 to the CSPF, and funds allocated under the 50% Rule, are not the private property of plaintiffs for Fifth Amendment Takings Clause purposes. This conclusion is consistent with *Phillips* and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980), because the conclusion is not, contrary to plaintiffs' assertions, dependent on any theory of "government-created value." In *Phillips*, the Supreme Court concluded that interest earned on funds deposited in pooled accounts under an Interest on Lawyers Trust Accounts ("IOLTA") program was private property. *Phillips*, 524 U.S. at 172. Under Texas law, attorneys were required to pool client deposits in an IOLTA account if the funds could not earn net interest if deposited separately. The interest on the pooled account was not apportioned among the clients, but diverted to foundations that financed legal services for low-income individuals. The Court found that the interest was, in fact, the private property of the clients, reasoning that the clients owned the principal and, under Texas law, interest is presumed to follow the principal that generates it. *Id*. at 165-66. The Court found that the fact that net interest could not have been earned had the clients' funds been deposited separately rather than in an IOLTA account, was irrelevant to the question of whether the interest, once earned, was private property. *Id*. at 169-70. The Court had reached a similar result in *Webb's*, concluding that interest accruing on an interpleader fund was the private property of the fund's beneficiaries. *Webb's*, 449 U.S. at 164-65. Florida law required that interpleader funds be deposited in the registry of the county clerk, and the interest earned on such funds was retained by the county as income. The Court found that the county's retention of the interest, under the specific statutory scheme in place, was a taking in violation of the Fifth and Fourteenth Amendments. In doing so, the Court relied heavily on a "long established general rule" that interest on interpleaded and deposited funds follows the

principal and should be allocated to the owners of the principal. *Id.* at 162-63. In the instant case, as in *Webb* and *Phillips*, the relevant inquiry is whether state law recognizes the asserted property right. The conclusion we reach here results from the fact that there is no long-standing right to the revenues earned from gambling on horse racing.

We could appropriately end our Takings Clause analysis here, as there is no taking if there is no private property in the first place. We are reluctant to do so, however, because our conclusion is potentially subject to counterarguments (outlined in the margin[4]) that have some force, though not enough to persuade us. We therefore assume for the sake of argument that revenues diverted to the CSPF and revenues diverted under the 50% Rule were—sufficiently for Takings Clause purposes—the private property of plaintiffs. Even if so, HB 561 clearly does not effectuate an unconstitutional taking.

The Supreme Court has consistently declined to create a set formula for identifying a "taking" forbidden by the Fifth Amendment and has instead prescribed an *ad hoc*, factual

---

[4]It might be argued that if the earnings (interest) on principal are the property of the owner of the principal under *Phillips* and *Webb's Fabulous Pharmacies*, then by parity of reasoning the earnings (profits) of an enterprise are the property of the owner of the enterprise. The fact that a controversial way of making money may over the years be alternately banned, heavily licensed, or permitted by the state, does not mean that the profits of such private enterprises, when legal, can be taken by the state without being subject to Takings Clause protection. And it is at least questionable whether this conclusion should be any different just because the alleged taking is effectuated by the same statute that legalizes the activity. Thus if peddling in a particular city, previously forbidden, were allowed by an ordinance, we might be reluctant to say that the city could—pursuant to the same ordinance—confiscate the peddler's profits. In our view, the fixed allocation of a new gambling pool is much farther removed in nature from the interest earnings on principal involved in *Phillips* than the hypothetical peddler's earnings from his efforts.

inquiry into the circumstances of each particular case. *See, e.g., Connolly v. Pension Benefit Gty. Corp.*, 475 U.S. 211, 224 (1986). In conducting such an inquiry, three factors have particular significance: the economic impact of the regulation on the claimant, the extent to which the regulation interfered with reasonable investment-backed expectations, and the character of the governmental action. *Id.* In the instant case, each of these factors weighs against finding a taking prohibited by the Fifth Amendment.

*1. The nature of the action.*

First, the challenged provisions are not by nature takings. Under HB 561, the government does not physically invade or permanently appropriate any of the plaintiffs assets for its own use. Instead, HB 561 represents an attempt by Ohio's General Assembly to protect and preserve Ohio's horse racing industry. It is true that the statutory scheme created by HB 561 includes provisions that allocate revenues from wagering on horse racing according to prescribed formulas, and that those formulas burden some race track operators and benefit others. It is well settled, however, that legislation that "adjusts the benefits and burdens of economic life to promote the common good . . . does not constitute a taking requiring Government compensation." *Connolly*, 475 U.S. at 225 (citations omitted).[5]

---

[5]At oral argument, counsel for the plaintiffs suggested for the first time that the diversion of revenues effected by the challenged provisions should be analyzed as *per se* takings, as the plaintiffs were completely deprived of such revenues. The merits of counsel's suggestion is questionable, *see Connolly*, 475 U.S. at 222-23 (recognizing that employer was permanently deprived of assets necessary to satisfy statutory liability to private party, but rejecting argument that said liability always constituted uncompensated taking prohibited by Fifth Amendment), and we decline to consider it absent briefing, particularly considering its potentially far-reaching implications for other areas of government regulation, and indeed upon the government's power to tax.

The plaintiffs contend that the CSPF and the 50% Rule do not benefit the general public, but instead benefit a select group of race track operators—namely the racetrack defendants. They argue that Ohio's aims of protecting and preserving its horse racing industry could have been accomplished by liberalizing the restrictions on simulcast racing, and that therefore the CSPF and the 50% Rule are extras that inure only to the benefit of private parties. Even assuming that Ohio could have achieved its goals of providing economic relief to the horse racing industry in another fashion, however, it does not follow that the balancing of interests codified in HB 561 was beyond Ohio's power to modify the economic benefits and burdens from wagering on horse races. Accordingly, we conclude that the nature of the action weighs against finding a taking.

### 2. *Interference with investment backed expectations.*

Second, the challenged provisions of HB 561 do not interfere with legitimate investment backed expectations. The district court observed that the same legislation that authorized simulcast-only racing also included the revenue allocation formulas to which the plaintiffs objected and concluded that the plaintiffs could have no reasonable expectation of a greater return on their investment than that provided under the CSPF and 50% Rule.

The plaintiffs offer several arguments as to why this up-front disclosure of the terms of participation did not prevent them from reasonably expecting higher returns. First, they argue that the district court's conclusion is tantamount to finding that participants in heavily-regulated industries have no choice but to accept even the most confiscatory regulations. "[I]t is not objectively reasonable," they contend, "to expect that the state will condition participation in the racing industry upon acceptance of a system which transfers earnings from one set of race track owners to another." Next, the plaintiffs charge that HB 561 disrupts normal expectations

as to how value generated through economic activity is apportioned among those performing the activity, because the distribution of funds from the CSPF is based on historical shares of racing revenues at Ohio race tracks, and because both the CSPF and the 50% Rule create disproportionate benefits and burdens among race track operators. Finally, the plaintiffs argue that they had a reasonable investment backed expectation that the introduction of simulcast-only racing would enhance revenues and enable them to offer larger purses at their own tracks.[6]

Even assuming, however, that the plaintiffs have accurately characterized the provisions of HB 561, these contentions are beside the point. To say that it is not reasonable to expect that the government enact such regulations, that such regulations are subject to challenge, or that such regulations conflict with normal business expectations does not change the fact that the plaintiffs were well aware of the CSPF and the 50% Rule prior to making any investments related to simulcast-only racing, and could not, therefore have reasonably expected a greater return. Consequently, this factor also weighs against finding a taking.

### 3. *Economic Impact.*

Finally, consideration of the economic impact of the challenged provisions of HB 561 does not support the conclusion that there has been a taking. The district court acknowledged that the CSPF and the 50% Rule had an adverse economic impact on the plaintiffs, at least to the

---

[6]Curiously, the plaintiffs do not actually allege that revenues have not increased or that they have been precluded from offering higher purses than before the implementation of HB 561. They simply allege that purse money that could have gone into their purse fund was diverted to the CSPF. At worst, it appears that the plaintiffs' revenues have increased after the passage of HB 561, just not as much as the plaintiffs would have liked.

extent that they were deprived of a portion of simulcast wagering proceeds.[7] The plaintiffs emphasize that, under the challenged provisions, significant portions of the revenue from wagering on simulcast-only racing at their facilities is diverted to others. The plaintiffs allege that, under the CSPF regulations, they have paid millions more into the CSPF than they have received in disbursements, and they note that, under the 50% Rule, one-half of the money wagered at the plaintiff satellite facility is allocated to other tracks.

In applying the economic impact factor, the Supreme Court has made clear that a complete deprivation of money that an enterprise is obligated to pay does not necessarily require the finding of a taking. In *Connolly*, the Court found that the retroactive application of the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 did not effect an unconstitutional taking under the Fifth Amendment. *Connolly*, 475 U.S. at 221-28. In considering the economic impact of the provisions, the Court reasoned:

> as to the severity of the economic impact of the [amendment], there is no doubt that the Act completely deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability. The assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions. Moreover, there are a significant number of provisions in the Act that moderate and mitigate the economic impact of an individual employer's liability. There is nothing to show that the withdrawal liability actually imposed on an employer

[7] As noted above, the plaintiffs do not actually claim that their revenues decreased after the passage of HB 561, but instead claim that their revenues would have increased more absent the challenged provisions.

will always be out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary consequence of the [amendment]'s regulatory scheme.

*Id*. at 225-26 (footnote omitted). Similarly in this case, the allocations are not made "in a vacuum," but depend upon factors that the legislature found reasonably related to the encouragement of live horse racing. As in *Connolly*, the payment of the revenues at issue is "a necessary consequence of the . . . regulatory scheme."

The plaintiffs argue that the economic impact of the CSPF is particularly onerous, because the formula for determining distributions creates a cycle in which they will always pay more into the fund than they receive out of it. Under the CSPF distribution formula, the plaintiffs contend, tracks with higher historical wagering are rewarded by higher distributions, which are dedicated to the tracks purse funds. More money available in a track's purse fund means that the track can attract better horses, which increases wagering, which in turn increases the track's share of the CSPF distributions. Indeed, the plaintiffs project that they will always pay more into the fund than they receive in distributions.

It appears, however, that the cycle complained is not a necessary consequence of the CSPF formula, but is instead rooted in the plaintiffs' business decisions. Tracks contribute to the CSPF only on days that they offer simulcast racing without also offering live racing. Plaintiff Raceway Park and Defendant Scioto Downs conducted live racing on roughly the same number of days, but Raceway Park conducted simulcast-only racing on 237 days, while Scioto Downs conducted such racing on only 9 days. Consequently, Raceway Park contributed significantly more to the CSPF. Raceway Park could have chosen to minimize its contributions to the fund by limiting the number of simulcast-

only race days it conducted.  It made a business decision not to do so.  Accordingly, we conclude that the economic burden factor weighs against finding a taking in this case.[8]

*B.   The challenged provisions do not violate the Equal Protection Clause or the Due Process Clause of the Fourteenth Amendment.*

The challenged provisions also do not violate the Equal Protection Clause.  Social and economic legislation, such as HB 561, that does not employ suspect classifications or intrude on fundamental rights must be upheld against equal protection attacks so long as the legislative means are rationally related to a legitimate government purpose. *Hodel v. Indiana*, 452 U.S. 314, 331 (1981).  Such legislation carries a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. *Id.* at 331-32. Indeed, "social and economic legislation is valid unless 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational.'" *Id.* at 332 (alteration in original) (*quoting Vance v. Bradley*, 440 U.S. 93, 97 (1979)). In this case the plaintiffs have not met the heavy burden of showing that the classifications employed by the Ohio General Assembly were irrational.

---

[8]The Supreme Court followed its *Connolly* economic burden analysis in a later case, also upholding the withdrawal liability provisions of the same amendments to ERISA against a Takings Clause challenge, where application of the statute resulted in loss of 46% of the affected party's net worth.  *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal,* 508 U.S. 602, 645 (1993).  The Court relied upon earlier cases holding squarely that diminution in the value of property is insufficient to demonstrate a taking. *Id., citing Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384 (1926) (approximately 75% diminution in value), and *Hadacheck v. Sebastian,* 239 U.S. 394, 405 (1915) (92.5% diminution).

In rejecting the plaintiffs' equal protection claim, the district court concluded that HB 561 made no indiscriminate classifications, but instead represented a "studied and well-considered statutory scheme established to address legitimate government objectives."  The plaintiffs argue that the CSPF regulations are arbitrary and irrational because the provisions bear no rational relationship to Ohio's asserted purpose and that they arbitrarily shift business revenues from one private business to another.  The plaintiffs' argument boils down to a disagreement with Ohio's determination on how best to protect and preserve horse racing in Ohio.  They claim that Ohio's goal could have been satisfied by liberalizing restrictions on simulcast racing and, therefore, that both the CSPF and the 50% Rule are unnecessary extras that confer benefits on the defendants at their expense.  Even assuming that Ohio's goals could have been achieved without the challenged provisions, they are not so unrelated to Ohio's purpose as to be irrational.  Ohio could reasonably determine that the benefits and burdens accompanying simulcast-only racing are different from those created by live horse racing, and determine that revenues for the two should be allocated differently.[9]

Similarly, the challenged provisions do not violate the Due Process Clause of the Fourteenth Amendment.  "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15 (1976). The plaintiffs argue that the challenged provisions are

---

[9]For example, live horse races in Ohio support related industries in ways that simulcasts do not.  Ohio could reasonably conclude that simulcast-only racing produced fewer benefits than live racing, and regulate to make such racing less profitable than live racing.

irrational and arbitrary because they are unrelated to Ohio's goal, that the CSPF is impermissibly retroactive, and that the regulations impermissibly seize private property for private use.

Although the plaintiffs would have preferred a different scheme than that embodied by HB 561, the measures enacted by the Ohio Assembly, as noted above, are related to Ohio's goal of protecting and promoting live horse racing in Ohio. The CSPF provisions, moreover, are not retroactive. While the distribution formula for the CSPF is based on historical calculations of racing revenue, a statute "is not made retroactive merely because it draws upon antecedent facts for its operation." *Landgraf v. USI Film Prods*, 511 U.S. 244, 270 n. 24 (1994) (*quoting Cox v. Hart*, 260 U.S. 427, 435 (1922)). Indeed, the plaintiffs can easily avoid any liability to the CSPF by refraining from taking advantage of the provisions permitting them to offer simulcast-only racing. Finally, the challenged provisions do not take private property for private use, as the plaintiffs have failed to establish a "taking" at all. Accordingly, we find that the plaintiffs have failed to establish that the challenged provisions violate their right to due process under the Fourteenth Amendment.

### III. Conclusion

For the reasons stated herein, the judgment of the district court is AFFIRMED.